WOLFE *et al.* v. THE MISSOURI· PACIFIC RAILWAY COMPANY, *Appellant.*

1. **Common Carrier:** WRONGFUL DELIVERY: ACTION FOR BY AGENT. An agent to whom goods are consigned by his principal, who ·has no pecuniary interest in them beyond his lien for commissions, and who contracts with a common carrier to deliver them to him at a designated place, is, under the statute (R. S. 1879, sec. 3463) the trustee of an express trust, and, by its terms, may maintain an action in his own name against the carrier for a wrongful delivery of the goods.

2. ——— : ———. The contract of the agent with the carrier calling for a delivery to the former's order, the carrier, by delivery to another as the true owner, assumes the burden of proving such ownership at the time of delivery. and, where the evidence shows that the possession of the goods had not been surrendered by the principal or his agent, delivery to a third person is without authority.

3. **Evidence :** COMMUNICATION BY TELEPHONE. One who places himself in connection with a telephone system through an instrument in his office, thereby invites communication in relation to his business through that channel, and conversations so held are as admissible in evidence as personal interviews by a customer with an unknown clerk in charge of an ordinary shop; and the fact that the voice at the telephone was not identified does not render the conversation inadmissible.

*Appeal from St. Louis City Circuit Court.*—HON. DANIEL DILLON, Judge.*

AFFIRMED.

*Bennett Pike* and *Henry G. Herbel* for appellant.

(1) The finding and judgment of the court are against the law and are unsupported by the evidence. *Malheny v. Mason*, 73 Mo. 683 ; *The Idaho Case*, 93 U. S. 575 ; *Bliven v. Railroad*, 36 N. Y. 403 ; *Sweetman v. Prince*, 26 N. Y. 232 ; *Bordewell v. Colie*, 1 Lansing, 141 ; *King v. Richards*, 6 Wheat. 418 ; *Claflin v. Railroad*, 7 Allen, 344 ; *Green v. Clark*, 12 N. Y. 343 ; *Potter v. Lansing*, 1 Johns. Rep. 223 ; Redfield on Railways, ( 5 Ed.) sec. 191 ; Dicey on Parties, 87 ; Bliss on Code Pleading, sec. 21 ; Hutchinson on Carriers, sec. 736 ; *White v. Chouteau*, 10 Barb. 202 ; *Redfield v. Middleton*, 7 Bosw. 649 ; *Swift v. Swift*, 46 Cal. 266 ; *Law v. Hatcher*, 4 Blackf. 364. (2) The declarations of law made by the court are erroneous. *The Idaho Case*, 93 U. S. 575 ; and other authorities, *supra*. (3) The finding and judgment are excessive. *Ober v. Railroad*, 18 Mo. App. 81.

*Taylor & Pollard* for respondents.

(1) Plaintiffs in their own name contracted with defendant to carry the wire from the west end of the bridge to Fourteenth and Gratiot streets, and there to deliver it to them as consignees. This, under the statutes, authorized them to maintain this action, even if the wire belonged wholly to the Cambria Iron Company, because a party in whose name a contract is made for the benefit of another, is a trustee of an express trust and such a trustee may sue without joining the beneficial owner. R. S., sec. 3463 ; Bliss on Code Plead., sec. 57 ; *Railroad v. Kirkwood*, 45 Mich. 54 ; Pomeroy on Rem. and Rem. Rights, sec. 177 ; *Wright v. Tinsley*, 30 Mo. 389 ; *Harney v. Dutcher*, 15 Mo. 89 ; *Rogers v. Gosnell*, 51 Mo. 468 ; Perry on Trusts, sec. 86 ; *Snider v. Adams Express Co.*, 77 Mo. 523. (2) The plaintiffs as consignees of the wire had the legal title thereto, and as

such could maintain this action. R., S. 1879, sec. 559 ; Benjamin on Sales, ( 3 Am. Ed.) 813 ; *Berger v. Railroad*, 13 Mo. App. 500 ; *Turney v. Wilson*, 7 Yerg. 515 ; *Railroad v. Nelson*, 1 Cald. 278 ; 2 Rorer on Railroads, p. 1330, sec. 5 ; 2 Redfield on the Law of Railroads, 189 ; Hutchinson on Carriers, sec. 130 ; Story on Agency, secs. 111–12. (3) The contract of the Cambria Iron Company with Fuchs and the invoices sent by plaintiffs to Fuchs did not vest the title, with the right of immediate possession of the wire in question, in Fuchs. Neither the consignors nor the consignees (plaintiffs) so disposed of the *jus disponendi* as to vest it in Fuchs. Benjamin on Sales ( 3 Am. Ed.) secs. 382, 399 ; *Bank v. Bangs*, 102 Mass. 295 ; *Bank v. Croker*, 111 Mass. 167 ; *Dows v. Bank*, 91 U. S. 630–1 ; *Chapman v. Kerr*, 80 Mo. 158 ; Hutchinson on Carriers, sec. 130.

BARCLAY, J.—Plaintiffs brought this action to recover damages for breach of a contract for the carriage and delivery of seven car-loads of wire. No questions arise requiring any special reference to the pleadings. They properly present the issues made by the facts hereafter discussed. The cause was tried by HON. DANIEL DILLON, as circuit judge, a jury having been waived.

It appeared at the trial that Henry Fuchs, a barb-wire manufacturer in St. Louis, in April, 1884, made a written contract with the Cambria Iron Company of Johnstown, Pa., by which the iron company was to furnish said Fuchs with "twelve tons of wire per day for twenty-five business days, beginning April 30 ; and then thirteen tons per day for twenty-five business days" at certain named prices ; settlements were to be monthly, "less two per cent. discount for payment in ten days from date of shipment ;" and that " the seller's responsibility for goods in transit should cease when they pass into custody of the transporting company." The iron company, in pursuance of this agreement, shipped ten

car-loads of wire.for said Fuchs, but consigned the same to Wolfe & Good ( the plaintiffs ), their St. Louis agents, at East St. Louis. On the arrival of the wire at East St. Louis, it was delivered to the St. Louis Bridge & Tunnel Company, by the Ohio & Mississippi Railway ( the terminal carrier ), in obedience to Wolfe & Good's instructions, and was by the Bridge & Tunnel Company then delivered to defendant for transfer and delivery at Pope's switch, Fourteenth and Gratiot streets, in St. Louis. No bill of lading was issued to Wolfe & Good or to any other person, by either the Bridge & Tunnel Company or the defendant, for the hauling of this wire from East St. Louis to St. Louis.

There was a custom prevalent with roads terminating at East St. Louis and St. Louis to designate the destination of cars, thus transferred across the river, by tacking a card of a particular color on the car door, which indicated to the receiving carrier the particular depot, switch, or side-track on which the car was to be placed, different colored cards representing the several depots, switches and side-tracks. The cars containing this wire were designated by blue cards, which indicated Pope's switch as' their destination. That was a private switch used by the Pope Iron & Metal Company and two or three other establishments, among them Fuchs' Wire Works.

The wire was shipped in three or four car-load lots. Three car-loads were received by defendant and delivered to Fuchs on written orders of Wolfe & Good. Prepayment of the purchase price of these three carloads was not exacted of Fuchs by Wolfe & Good. The remaining seven cars were delivered by defendant to Fuchs, on his demand, at different dates in May, 1884. That delivery constitutes the gist of this action. Whether it was made with the consent of plaintiffs, Wolfe & Good, or without it, was the main issue of fact tried. The evidence conflicted on that point. The

trial court found that the delivery was without their consent.

It further appeared in evidence that plaintiffs, as agents for the Cambria Iron Company, had no other pecuniary interest in the wire than for the payment of their commissions; and that immediately upon receipt of advices from the Cambria Iron Company of the shipment in controversy, Wolfe & Good had sent to Fuchs invoices, or bills of account, for the car-loads in question, which he received several days before the wire arrived. In the progress of the trial, the court admitted testimony of alleged conversations by telephone connected with plaintiffs' office, though the witness did not identify the voice he heard at their instrument.

The court made the following declarations of law against defendant's objections, viz. :

"The court declares the law to be that a person in whose name a contract is made for the benefit of another is a trustee of an express trust, and as such can maintain an action in his own name. If, therefore, the court finds from the evidence, that the contract of the defendant to carry the goods in question from the place where it received the same to Fourteenth and Gratiot streets, was made in the name of plaintiffs, though for the benefit of the Cambria Iron Company, then the plaintiffs would have a standing in court and could recover if the delivery to Fuchs was wrongful.

"The court further declares the law to be, that if it finds from the evidence, that on the arrival of the goods in question at East St. Louis, the plaintiffs received said goods in pursuance of the bills of lading read in evidence; that thereafter plaintiffs ordered the St. Louis Bridge & Tunnel Railroad Company to have said goods delivered to Fourteenth and Gratiot streets; that the delivery of said goods included the hauling of said goods from the eastern terminus of defendant's railroad to said Fourteenth and Gratiot streets; that said

defendant received said goods of said St. Louis Bridge & Tunnel Railroad Company, and, in delivering said goods, defendant acted in law simply as agents of plaintiffs, and if the court further finds that such contract for delivering by defendant was made in the name of plaintiffs, then said plaintiffs would stand in the relation of trustee of an express trust, and as such, could sue defendant for the goods in question if wrongfully delivered.

"The court further declares the law to be, that defendant had nothing to do with the contract between the Cambria Iron Company and Fuchs for the purchase of wire. The defendant could not constitute itself an arbitrator touching any matter of difference between the parties of said contract. It was the duty of the defendant to deliver the goods in question to Wolfe & Good, the consignees, or else to such person as they might deliver the bills of lading properly indorsed, or else such person as they might order said defendant to deliver the goods to."

The court then found for plaintiffs in the sum of $7,028.17, the value of the seven car-loads of wire. After moving for a new trial without avail and duly saving exceptions, defendant appealed.

I. Plaintiffs' right to maintain this action was made an issue by the answer. It is naturally the first subject of consideration. The goods in question were billed by the iron company to plaintiffs at East St. Louis. They received them there and in their own firm name contracted for their delivery at Pope's switch in St. Louis to themselves. They were acting as factors for the iron company in the transaction, having no pecuniary interest in the goods beyond their lien for commissions. By our code of practice it is provided that every civil action must be prosecuted in the name of the real party in interest, with certain exceptions. Among these is a "trustee of an express trust," who may sue in his name without joining the person for

whose benefit the action is prosecuted. The statute explicitly declares that "a trustee of an express trust, within the meaning of this section, shall be construed to include a person with whom, or in whose name a contract is made for the benefit of another." R. S. 1879, sec. 3463. Plaintiffs fairly come within this statutory definition. In this regard the code merely designed to preserve a right of action which existed by the modern common law .of England on such facts as here appear. *Short v. Spakeman,* (1831,) 2 B. & Ad. 962; *Drinkwater v. Goodwin,* 1 Cowp. 251. Our statute, above quoted, is the same as a section of the code of New York. The uniform interpretation of it there permits such actions as this' to be maintained. *Grinnell v. Schmidt,* (1850,) 2 Sandf. 706; *Considerant v. Brisbone,* (1860,) 22 N. Y. 389; *Ladd v. Arkell,* 37 N. Y. Superior Ct. 40; *Wetmore v. Hegeman,* (1882,) 88 N. Y. 72. We are of opinion that the instructions correctly declared the law regarding plaintiffs' right to sue.

II. On the merits, the chief contention of defendant is, that the facts here presented, explained by the terms of the contract between the iron company and Fuchs, justified the delivery of the wire in question to Fuchs. On this branch of the case, the only facts that can properly be reviewed are those which now remain admitted or undisputed. An issue was determined in the trial court regarding this delivery to Fuchs, defendant asserting that plaintiffs consented to it and plaintiffs denying that assertion. On that issue the evidence was quite conflicting. No sufficient reason has been assigned for disturbing the finding of Judge DILLON that plaintiffs did not assent to such delivery. That was evidently the chief point of difference in the case and its decision has greatly narrowed the field of this controversy.

Defendant concedes its duty to carry and deliver the wire to Pope's switch; but claims that, on the

undisputed facts, Fuchs was the true owner, and that its delivery to him was therefore lawful. Undoubtedly a carrier, in some circumstances, may deliver goods to the true owner instead of to him who gave them into its charge for carriage. Its contract (subject to certain exceptions not in consideration here) is to carry and deliver (according to shipper's orders), or to account for the goods. It would be a lawful accounting to show that they had been delivered to the real owner upon his demand. This principle is now so well established in the law that the mere statement of it will suffice for the purposes of this case. *The Idaho*, 93 U. S. 579.; *West. Trans. Co. v. Barber*, 56 N. Y. 544.

But to justify a delivery to the true owner contrary to, or without the orders of the shipper, the carrier assumes the burden of proving the ownership at the time of such delivery. Among other things it must establish the immediate right of possession in the person to whom such delivery is made. Referring to the facts before us, it may have been a breach of the contract (existing between Fuchs and the iron company) for the latter to refuse to deliver the wire to the former without prepayment of the price. But the carrier, engaged to convey the wire to the point of contemplated delivery, could not lawfully transfer to the purchaser the right of possession, if the shipper did not, in fact, part with that right.

Whether the seller retains the *jus disponendi* (as the text-writers term it) is often a question of fact, depending on the intention of the parties to be gathered from their acts, as in this instance. The disposition of the bill of lading, which in the commercial world is recognized as the emblem of the property itself, frequently throws light on that intention. Here the owner did not bill the wire to the purchaser, but consigned it to its own local agents, the plaintiffs. The latter, without transferring the bills of lading, made a

further contract of their own, whereby defendant was to carry the goods to the place where delivery to the purchaser was expected to be made.    This last contract for carriage was evidenced by no writing, but its terms are not disputed.   The wire was deliverable by defendant at Pope's switch, only to the order of plaintiffs, though such order might ( in the circumstances ) have been merely verbal.    The invoices and contract of sale between Fuchs and the iron company were admitted in evidence as part of the *res gestae*, explanatory of the acts of the parties ; but the carrier was no party to the contract and had no right to act on its own interpretation of the duties which the parties owed to each other according to its terms.

Whether or not under it, the shipper's agents should have delivered possession of the wire to the purchaser on its arrival at the switch, was a question which it did not devolve on the carrier to decide.    Until the shipper, whose goods it had in charge, parted with the right of possession, the intending purchaser did not become the owner.    Until then, any delivery by the carrier to him ( on the facts here considered ) was at its own risk.

There was ample testimony to support the finding of the trial court that the right of possession was not surrendered by the seller or its agents, the plaintiffs, and that the delivery by the carrier was without authority.    The instructions given by the trial court correctly stated these principles.

III.    A question arose incidentally at the trial upon the admission in evidence of a conversation held through the telephone between some one at the instrument in plaintiffs' private office and the witness.    It was admitted, though the witness did not identify the voice of the speaker as that of either of the plaintiffs or their clerk.    The courts of justice do not ignore the great improvement in the means of intercommunication

which the telephone has made. Its nature, operation and ordinary uses are facts of general scientific knowledge, of which the courts will take judicial notice as part of public cotemporary history. When a person places himself in connection with the telephone system through an instrument in his office, he thereby invites communication, in relation to his business, through that channel. Conversations so held are as admissible in evidence as personal interviews by a customer with an unknown clerk in charge of an ordinary shop would be in relation to the business there carried on. The fact that the voice at the telephone was not identified does not render the conversation inadmissible. The ruling here announced is intended to determine merely the admissibility of such conversations in such circumstances, but not the effect of such evidence after its admission. It may be entitled, in each instance, to much, or little weight in the estimation of the triers of fact, according to their views of its credibility, and of the other testimony in support, or in contradiction of it.

Finding none of the assignments of error well taken, we affirm the judgment, all concurring.