# PERE MARQUETTE RAILWAY COMPANY *v.* J. F. FRENCH & COMPANY.

## CERTIORARI TO THE SUPREME COURT OF THE STATE OF MICHIGAN.

No. 105. Argued November 19, 1920.—Decided January 17, 1921.

1. Upon arrival of a carload of goods at destination, the carrier at the direction of the person in possession of the bill of lading turned over the car to another carrier for further carriage, the old waybill being retained with the names of the new carrier and new destination inserted in lieu of the old. *Held*, a delivery under the original consignment. P. 542.

2. Under the Uniform Bills of Lading Act, a carrier is justified in delivering the goods to the person in physical possession of the order bill of lading properly endorsed, unless it has information that such person is not lawfully entitled to them. P. 543.

3. A delivery to a person holding such a bill as the agent of another person is tantamount to a delivery to the latter if ratified by him. P. 544.

4. The exoneration of the carrier resulting under the act from a delivery in good faith to a person in possession of the bill of lading properly endorsed, is not defeated by failure of the carrier to take up the bill, if no loss is occasioned by such failure. P. 545.

5. Where a carrier delivered the goods to one who had without right acquired possession of the bill of lading apart from a draft originally attached by the shippers, *held*, that the shippers, upon buying back the bill and the draft with full knowledge of the facts did not become *bona fide* purchasers of the bill within §§ 10–12 of the Uniform Bills of Lading Act, since the purpose of those sections is to give bills of lading the attributes of commercial paper, and they protect only purchasers who are entitled to assume that the goods have not been delivered and that they will not be except to a holder of the bill of lading. P. 545.

6. The Uniform Bills of Lading Act does not impose upon the carrier a specific duty to the shipper to take up the bill of lading. P. 546.

7. Noncompliance with a clause of a bill of lading requiring its surrender before delivery of the goods will not render the carrier liable to the shipper for conversion when the delivery is to the holder of

the bill, duly endorsed, or his agent, and the loss resulting to the shipper is not attributable to the carrier's failure to take up the bill, but to the deliveree's wrongful acquisition of the bill and subsequent conduct, for which the carrier was not responsible. P. 546.

204 Michigan, 578, reversed.

THE case is stated in the opinion.

Mr. Oscar E. Waer, with whom Mr. John C. Shields was on the briefs, for petitioner.

Mr. Clare J. Hall, with whom Mr. Joseph R. Gillard and Mr. Myron McLaren were on the brief, for respondent.

MR. JUSTICE BRANDEIS delivered the opinion of the court.

The Federal Uniform Bills of Lading Act of August 29, 1916, c. 415, 39 Stat. 538, provides by § 9 that a carrier is, subject to the provisions of §§ 10, 11 and 12, "justified . . . in delivering goods to one who is"

(c) "A person in possession of an order bill for the goods. by the terms of which the goods are deliverable to his order; or which has been endorsed to him, or in blank by the consignee, or by the mediate or immediate indorsee of the consignee."

The main questions presented for our decision in this case are, whether, upon the facts hereinafter stated, there was a delivery to one in possession of the bill, and, if so, whether the delivery exonerated the carrier, it having been made without requiring surrender of the bill of lading.

In 1917 J. F. French & Company shipped a carload of potatoes from Bailey, Michigan, to Louisville, Kentucky, by the Pere Marquette Railroad as initial carrier and the Big Four Railroad as connecting and terminal carrier. The shipment was made on a "consignor's order" bill of

lading in the standard form by which the car was consigned to the shipper's order at Louisville; and there was a notation: "Notify Marshall & Kelsey, c/o Capt. Bernard, Commissary, Camp Zachary Taylor." The shipper attached the bill of lading to a draft on Marshall & Kelsey for the purchase price of the potatoes and sold and delivered both, duly endorsed in blank, to a bank at Grand Rapids. This bank transmitted for collection the draft, with bill of lading attached, to an Indianapolis bank. The latter, without obtaining payment of the draft, detached the bill of lading from it and wrongfully delivered the bill of lading to Marshall & Kelsey. The car having reached Louisville, its destination named in the bill of lading, it was physically delivered by the Big Four, upon request of one Bindner, to the Southern Railroad to be forwarded to Dumesnil, under the circumstances hereinafter set forth, without requiring surrender of the bill of lading. Later upon the refusal of Marshall & Kelsey to accept the potatoes and honor the draft, possession of the car and bill of lading was returned to the shippers who accepted them under protest and, without waiving any rights which they might have, proceeded to dispose of the potatoes elsewhere in order to make the damage as light as possible for all concerned. The shippers then brought this suit in a state court of Michigan against the Pere Marquette to recover compensation, contending that the carrier had by delivering the car upon request without requiring surrender of the bill of lading become liable for conversion of the potatoes. The court directed a verdict for plaintiff; and the judgment entered thereon was affirmed by the Supreme Court of Michigan. 204 Michigan, 578. The case comes here on writ of certiorari. 250 U. S. 637.

The following additional facts are material: Camp Zachary Taylor was located about six miles from Louisville on the Southern Railroad, near Dumesnil station.

Marshall & Kelsey had contracted with the Government to supply a large quantity of potatoes at this camp; and had made a contract of purchase with J. F. French & Company. The car in question was shipped to Louisville to be applied on these contracts. The endorsed bill of lading for this, as for other cars shipped under like circumstances, had been left by Marshall & Kelsey at Dumesnil with one Bindner, an employee of the Southern Railroad, for safe-keeping. He, having the bill of lading in his possession at Dumesnil, telephoned from there, at Marshall & Kelsey's request, to the Big Four Railroad to ascertain whether the car had arrived at Louisville. Finding that it had, Bindner, knowing the Government's need of potatoes, told the Big Four trackage clerk that "he had the bill of lading and to let the car go out to the camp." Bindner had no specific instructions from Marshall & Kelsey to do this; but his action was later ratified by them. Upon receiving Bindner's further assurance that a small demurrage charge which had accrued would be paid, the trackage clerk, without requiring surrender of the bill of lading, released the car, changed the waybill so as to provide for delivery of the car at Dumesnil, and turned it over to the Southern. A charge of 6 cents per hundred pounds thereby became payable to the Southern Railroad for the local carriage from Louisville to Dumesnil; and it was left by the waybill payable by the consignee with the other freight charges upon receipt of the car at Dumesnil. The Big Four had no information that the draft covering the car had not been paid or of the circumstances under which Bindner obtained possession of the bill of lading. The car arrived at Dumesnil, but the Government did not accept it. Thereupon Bindner returned the bill of lading to Marshall & Kelsey upon their request; they returned it to the Indianapolis bank; this bank returned it and the draft to the Grand Rapids bank; which in turn surrendered both to J. F. French & Company, upon being

repaid the sum originally credited to their account. The shippers then took possession of the car; disposed of the potatoes elsewhere, but at a lower price; and brought this suit to recover the amount of their loss. The evidence is in conflict concerning the reason for the failure of the Government to accept the potatoes, their condition, and the cause of deterioration in them, if any; and no finding of fact was made by the Supreme Court of Michigan on this issue. But, in an action for conversion the matter could affect only the question of damages and not that of liability; and it is not material in the view which we take of the case.

There is no controversy over the amount of the loss. Nor is it denied that suit was properly brought against the Pere Marquette as initial carrier. The shipment was interstate. The shippers sue the initial carrier under § 20 of the Act to Regulate Commerce as amended contending that there was a conversion of the goods by a misdelivery of them at Dumesnil instead of a delivery at Louisville; or, if it be held that there was a delivery at Louisville, that it was an unjustifiable delivery in violation of the contract of carriage, since a clause in the bill of lading declared: "The surrender of this original bill of lading properly endorsed shall be required before delivery of the property." The carrier defends on the ground that there was a delivery at Louisville which exonerated it under § 9 of the Federal Uniform Bills of Lading Act. Is the carrier liable for misdelivery, because the car was sent from Louisville to Dumesnil upon Bindner's request without requiring surrender of the bill of lading?

*First.* The Supreme Court of Michigan held that the Big Four in sending the car over the Southern to Dumesnil at the request of Bindner made not a delivery but an irregular reconsignment. Whatever name be used in referring to the act of forwarding the car, the Big Four, when it surrendered possession of the car to the Southern at Bind-

ner's request, terminated its relation as carrier; just as it would have done if, at his request, it had shunted the car onto a private industrial track or had given the control of it to a truckman on the team tracks.   Having brought the goods to the destination named in the bill of lading the carrier's only duty under its contract was to make a delivery at that place; and it could make that delivery by turning the goods over to another carrier for further carriage.   Compare *Bracht* v. *San Antonio & Aransas Pass Ry. Co.*, *ante*, 489; *Seaboard Air-Line Railway* v. *Dixon*, 140 Georgia, 804; *Melbourne & Troy* v. *Louisville & Nashville R. R. Co.*, 88 Alabama, 443.   The fact that in forwarding the car the Big Four used the original waybill, striking out the word "Louisville" under the "destination" and substituting "Dumesnil, Ky. So. R. R." is of no significance.   The shipment from Louisville to Dumesnil was a wholly new transaction.   In turning over the car for this new shipment the railway made a disposal of it in assumed termination and discharge of its obligations, which was, in legal contemplation, a delivery. Whether it was a justifiable delivery and did indeed discharge its obligations we must next consider.

, *Second.*   Was the delivery at Bindner's order one which the carrier was justified in making under the provisions of § 9 of the Federal Uniform Bills of Lading Act?   Prior to the enactment of the Federal Uniform Bills of Lading Act, or of other applicable legislation, a carrier was not ordinarily relieved from liability to the consignor or owner for delivery of goods to a person not legally entitled to receive them, although such person was in possession of an order bill of lading duly endorsed in blank, and surrendered it to the carrier at the time of delivery.   Delivery was held not to be a justification because the bill of lading, despite insertion therein of words of negotiability, did not become a negotiable instrument.   Independently of statute (and, indeed, also under earlier state statutes) the

insertion of words of negotiability had merely the effect
of enabling title to the goods to be transferred by transfer
of the document. See *Berkley* v. *Watling*, 7 A. & E. 29.
But one who did not have a valid title to the goods could
not by transfer of the bill of lading give a good title to a
*bona fide* holder. *Shaw* v. *Railroad Co.*, 101 U. S. 557.
When in the interests of commerce the Federal Uniform
Bills of Lading Act extended to bills of lading certain
characteristics of negotiable paper in order to protect a
*bona fide* purchaser of such bills, it was deemed proper to
afford also certain protection to the carrier. This was
done, in part, by providing in § 9 that the carrier would
be justified in making delivery to any person in possession
of an order bill of lading duly endorsed, with certain ex-
ceptions to be noted below.

The shippers contend that Bindner was not "a person
in possession" of the bill, because he held it as agent for
Marshall & Kelsey and not on his own account. So far
as the carrier is concerned that fact is entirely imma-
terial. Under § 9 it is physical possession of the bill which
is made a justification for delivery of the goods by the
carrier. Under that section it is immaterial in what
capacity the person holds possession of the bill, and also
whether he holds it lawfully or unlawfully, so long as the
carrier has no notice of any infirmity of title. But the
shippers' contention would not be advanced if it were held
that the legal, not the physical, possession is determina-
tive. For Bindner's request of the trackage clerk to have
the car forwarded to Dumesnil was later ratified by Mar-
shall & Kelsey. If his physical possession of the bill
were deemed legally their possession of it, the physical
delivery to him of the car would likewise be deemed legally
a delivery of it to them and, hence, satisfy in this respect
the requirements of § 9.

The only exception to the rule justifying the carrier in
making delivery to one in possession of an order bill of

lading endorsed in blank, which is urged as applicable here, is where the carrier has information that the person in possession of the bill is not lawfully entitled to the goods. The shippers contend that the Big Four when it made delivery of the car had such information regarding Bindner. For this contention there is not the slightest basis in the evidence. The Big Four had no such information. Nor was there in the circumstances anything which should even have led it to doubt that Bindner was lawfully entitled to request that the car be shipped to Dumesnil.

Concluding, therefore, that there was a delivery, that it was made to a person in possession of the bill of lading properly endorsed and that it was made in good faith, the important question remains: Does such a delivery exonerate the carrier upon suit by the shipper when it failed to require surrender of the bill of lading as provided in that instrument? In our opinion there is no exoneration where loss to shipper or subsequent purchaser of the bill results from such a failure; but where the loss suffered is not the result of the failure to take up the bill, mere failure to take it up does not defeat the exoneration.

The plaintiffs seek to establish the carrier's liability for its failure to take up the bill on two theories,—first, that they are *bona fide* purchasers of the bill left outstanding; and second, that as shippers and owners their goods were converted by a delivery in violation of the terms of the bill of lading. But the shippers cannot claim the protection of § 11 of the act as *bona fide* purchasers of the bill, as those words are understood in the law, even if in taking back the draft and the bill of lading from the bank they can be deemed purchasers within the meaning of the act. They took back the bill of lading after the events here in question, with full knowledge of them, and because of them. The purchaser whom the act protects is he who is entitled to assume that the carrier has

not delivered the goods and will not thereafter deliver
them except to a person who holds the bill of lading. The
purpose of §§ 10, 11 and 12 is to give bills of lading at-
tributes of commercial paper. Here the plaintiffs were
not buying commercial paper but a law suit.

There is nothing in the act which imposes upon the
carrier a specific duty to the shipper to take up the bill
of lading. Under § 8 the carrier is not obliged to make
delivery except upon production and surrender of the
bill of lading; but it is not prohibited from doing so. If
instead of insisting upon the production and surrender
of the bill it chooses to deliver in reliance upon the assur-
ance that the deliveree has it, so far as the duty to the
shipper is concerned, the only risk it runs is that the per-
son who says that he has the bill may not have it. If
such proves to be the case the carrier is liable for con-
version and must, of course, indemnify the shipper for
any loss which results. Such liability arises not from the
statute but from the obligation which the carrier assumes
under the bill of lading.

Does a delivery without compliance with the surrender
clause of the bill of lading render the carrier liable for
conversion under the facts shown here? Although there
is a conflict of language in the cases in which a shipper
sues a carrier for delivery of goods without requiring a
surrender of the bill of lading, there appears to be no
conflict of principle or in decision. Where the failure to
require the presentation and surrender of the bill is the
cause of the shipper losing his goods, a delivery without
requiring it constitutes a conversion. *Babbitt* v. *Grand
Trunk Western Ry. Co.*, 285 Illinois, 267; *Turnbull* v.
*Michigan Central R. R. Co.*, 183 Michigan, 213; *Judson*
v. *Minneapolis & St. Louis R. R. Co.*, 131 Minnesota, 5;
see *First National Bank* v. *Oregon-Washington Railroad &
Navigation Co.*, 25 Idaho, 58; compare *Georgia, Florida &
Alabama Ry. Co.* v. *Blish Milling Co.*, 241 U. S. 190. But

where delivery is made to a person who has the bill or who has authority from the holder of it, and the cause of the shipper's loss is not the failure to require surrender of the bill but the improper acquisition of it by the deliveree or his improper subsequent conduct, the mere technical failure to require presentation and surrender of the bill will not make the delivery a conversion. *Chicago Packing & Provision Co.* v. *Savannah, Florida & Western Ry. Co.,* 103 Georgia, 140; *Famous Mfg. Co.* v. *Chicago & Northwestern Ry. Co.,* 166 Iowa, 361; *Nelson Grain Co.* v. *Ann Arbor R. R. Co.,* 174 Michigan, 80; *St. Louis Southwestern Ry. of Texas* v. *Gilbreath,* 144 S. W. Rep. (Tex. Civ. App.) 1051. In the *Chicago Packing Co. Case, supra,* the court said, "The loss in the present case was not occasioned by the failure of the railway company to require the production and surrender of the bills of lading, but by the faithlessness of Hobbs & Tucker to their principal." Similarly, in the case before us, the failure of the carrier to require production and surrender of the bill of lading did not cause the loss. The same loss would have resulted if the bill had been presented and surrendered. The real cause of the loss was the wrongful surrender of the bill of lading by the Indianapolis bank to Marshall & Kelsey by means of which the car was taken to Camp Zachary Taylor and the shipper deprived of the Louisville market. Nor did the failure to take up the bill enable the buyer to throw back the loss upon the shippers. The shippers deliberately assumed the loss by their voluntary act in taking back the draft and the bill of lading which they had sold to the Grand Rapids Bank. Doubtless J. W. French & Company's relations with Marshall & Kelsey and with the Grand Rapids Bank and the relations of the latter with the Indianapolis Bank made this course advisable. But it is clear that they were under no duty to do so, since the tortious act of the Bank's agent for collection had occasioned the damage. Having as-

sumed the loss of their own volition they should not be
permitted to pass it on to the carrier merely because of
its technical failure to take up the bill of lading. The
delivery was made to one in possession of the bill of lading
who could, and doubtless would, have surrendered it, had
he not been prevented by distance from doing so. To
hold a carrier liable under such circumstances would
seriously interfere with the convenience and the practice
of business.

                                              *Reversed.*

  MR. JUSTICE HOLMES did not take part in the consid-
eration and decision of this case.