## Pennsylvania Railroad Company v. Edson Brothers.

*Railroads—Bills of Lading—Delivery to person other than consignee.*

1. A carrier may deliver to the consignee in a straight (*i. e.*, non-negotiable) bill of lading, without the production and surrender of the bill of lading, but the delivery to any other person without an order from the consignee or the endorsement of the bill of lading constitutes a conversion.

*Railroads—Delivery of freight to wrong party by mistake—Recovery—Act of June 8, 1881.*

2. Under the Act of June 8, 1881, P. L. 86, a carrier, which has parted with its possession of the goods delivered to it for shipment to a person not entitled thereto by mistake, may, after demand, maintain an action of replevin for the goods, or, if they cannot be found, an action of *assumpsit* or trover against the party to whom delivery has been made.

*Binding instructions—Credibility of witnesses.*

3. Although ordinarily the credibility of a witness is for the jury, even though his testimony be uncontradicted, yet where uncontradicted testimony of witnesses is corroborated by independent documentary evidence which there is no reason to doubt, the court is warranted in directing a verdict.

Rule for judgment *n. o. v.* C. P. No. 1, Phila. Co., June T., 1924, No. 1105.

*Barnes, Biddle & Morris*, for plaintiff; *J. H. Shoemaker*, for defendant.

TAULANE, J., Feb. 26, 1927.—The verdict was for the defendants, and the plaintiff moves for judgment *non obstante veredicto*.

On Feb. 21, 1922, Emerson and Overstreet delivered to the Gulf, Colorado and Santa Fé Railway Company at Ballinger, Texas, 423 cases of eggs for shipment to themselves at Philadelphia. The eggs were shipped in car 7255 SFRD, and Emerson and Overstreet received from the railway company a straight, or non-negotiable, bill of lading, dated Feb. 21, 1923, wherein they were named as consignees.

On Feb. 23, 1922, Emerson and Overstreet notified Nice and Schreiber by letter that the eggs had been shipped in car 7255 SFRD on Feb. 21st, and that they had drawn a draft on them for $3000, with the bill of lading attached.

On the same day, Emerson and Overstreet forwarded for collection, through their local bank, the draft, containing a notation thereon that the car was 7255 SFRD, with the bill of lading attached.

In due course, the Federal Reserve Bank at Philadelphia received the draft for collection and presented it to Nice and Schreiber for payment. Nice and

Schreiber paid the draft on Feb. 28, 1922, and received the draft and bill of lading.

The eggs arrived in Philadelphia, *via* the Pennsylvania Railroad, on March 3, 1922. They were shipped for sale on commission, the draft being on account of the proceeds of sale, but, due to market conditions, the amount of the draft exceeded the value of the eggs. Nice and Schreiber inquired of the railroad from time to time about the arrival of the car, but did not notify the railroad that they held the bill of lading.

The defendants' name did not appear in the bill of lading, yet the railroad, on the day the car arrived, notified the defendants of its arrival and requested them to remove the eggs. Late that day the railroad permitted the defendants to remove 229 cases without the production of either the bill of lading or an order or other authority from Emerson and Overstreet, the consignees, but early the next morning the railroad in some way discovered the eggs belonged to Nice and Schreiber and refused defendants delivery of the balance of the eggs. The defendants then communicated with Nice and Schreiber and notified them not to pay the draft [already paid Feb. 28, 1922] which Emerson and Overstreet had drawn on them for the eggs.

The mistake in delivering to the defendants, the railroad says, was due to the fact that the defendants had been receiving eggs from Emerson and Overstreet, and from that fact its clerks hastily concluded that the car in question was intended for the defendants. The railroad notified Nice and Schreiber on March 7, 1922, of the arrival of the car, and delivered the balance of the eggs to them on March 8, 1922, paying them, however, for the eggs erroneously delivered to the defendants.

The railroad has instituted this suit against the defendants to recover the value of the eggs mistakenly delivered to them.

If the defendants had no title or interest in the eggs, and the railroad has not estopped itself, there can be no question about the right of the railroad to recover: McCrossan v. Reilly, 33 Pa. Superior Ct. 628; Penna. R. R. Co. v. Farrell, 64 Pa. Superior Ct. 296; Pittsburgh, &c., R. R. Co. v. Baker, Smith & Co., 81 Pa. Superior Ct. 388.

The Act of June 8, 1881, P. L. 86, is merely declaratory of the common law and reads as follows: "That any carrier or other bailee of property, who has parted with its possession by mistake to any person not entitled to the possession, may, after demand, maintain an action of replevin for the same, or, if the property cannot be found, an action of *assumpsit* or trover and conversion against the party converting or removing it."

Did the defendants have any title or interest in the eggs? Prior to Feb. 21, 1922, Emerson and Overstreet had been shipping eggs to the defendants for sale on commission, drawing on the defendants by draft, with bill of lading attached, for part of the proceeds of sale. To secure the bills of lading and obtain delivery from the railroad, the defendants were obliged to pay the drafts. There is no suggestion that the defendants either purchased or agreed to buy the eggs in question. The defendants say that Emerson and Overstreet originally intended to ship the eggs to them for sale on commission, but later dishonestly changed their mind and sent them to Nice and Schreiber for sale. Whoever received the eggs for sale would have been obliged to advance $3000 on account, which turned out to be more than they were worth.

It appears that on Feb. 20, 1922, the day before the eggs were shipped and three days before the draft was drawn on Nice and Schreiber, Emerson and Overstreet wired the defendants as follows: "Car eggs ready to ship today. Where do you want to go. Answer quick."

The defendants did not reply to this telegram until Feb. 27th, when they wired: "Have your bank wire Federal Reserve here reduce draft six dollars case quick."

In the meantime, the draft on Nice and Schreiber, with the bill of lading attached, was forwarded for collection; in fact, Nice and Schreiber paid the draft on them the day following the defendants' first acknowledgment of Emerson and Overstreet's telegram of Feb. 20th.

The defendants contend that Emerson and Overstreet drew on them for $3000.

There is some confusion in the testimony, due to certain telegrams, whether Emerson and Overstreet did really draw on the defendants for the particular eggs in controversy, but it is immaterial if they did, because they never agreed to reduce the amount of the draft, and the draft was never paid by the defendants.

The eggs belonged to Emerson and Overstreet and they had the unquestioned right to dispose of them as they saw fit. They were careful to consign them to themselves, and by so doing they retained full title in themselves.

Thus in Williston on Sales (2nd ed.), § 283, it is said: "The property is retained where the seller or his agent is consignee. It follows from what has been said that if the seller takes a bill of lading in which he is named as consignee as well as consignor, the carrier is a bailee for the seller, not the buyer, and the title is retained. The practice of taking bills of lading in this form has been common for centuries in order to preserve to the seller a hold upon the goods during transit, and many cases have sustained the validity of this retention of title. . . . There seems no doubt that the seller who thus consigns the goods to himself has complete control over them, and that the so-called *jus disponendi* is in fact title. The seller may not only retain the goods until the buyer performs his obligations under the contract, but may, even in violation of the contract, dispose of them to third persons. If the seller does this, of course, he is liable in damage to the buyer, but the second purchaser from the seller acquires an indefeasible right. It is not ordinarily material for the seller's protection whether the bill of lading is an order bill or a 'straight' bill naming him as consignee without the word 'order.' Though, as will be seen if the bill is in the latter form, the carrier need not require production or surrender of the bill, yet delivery must be made to the consignee, and this enables the seller to control the goods at their destination."

As the eggs were not consigned to the defendants, and they never paid the draft, if drawn, they acquired no title or interest in the eggs.

If the eggs had been consigned to the defendants, and Emerson and Overstreet retained the bill of lading and attempted to endorse it to Nice and Schreiber, probably Emerson and Overstreet would have had no title to transfer (Conard v. Atlantic Ins. Co., 1 Peters, 386; Brown v. Floersheim Mercantile Co., 206 Mass. 373, and Hallgarten v. Oldham, 135 Mass. 1), yet in such a case notice to the consignee of the endorsement of the bill of lading would have protected the transferee unless the consignee was a holder for value: Teller v. American Ry. Express, 78 Pa. Superior Ct. 300; Holmes v. German Security Bank, 87 Pa. 525; Holmes v. Bailey, 92 Pa. 57; Hinrichs v. Standard Trust and Savings Bank, 279 Fed. Repr. 382; Pennsylvania Sales Act of May 19, 1915, § 34, P. L. 543, 553; Federal Bill of Lading Act of August 29, 1916, ch. 415, § 32; 8 United States Compiled Statutes, par. 8604, P. P., page 9317.

No such question arises in this case, because the eggs were not consigned to the defendants. A carrier may deliver to the consignee in a straight bill of

lading without the production and surrender of the bill of lading, but a delivery to any other person without any order from the consignee or the endorsement of the bill of lading constitutes a conversion: Youl v. Harbottle, 1 Peake, 68, and Pere Marquette Ry. Co. v. French, 254 U. S. 538.

For delivering 229 cases to the defendants the railroad became liable to Nice and Schreiber for the value of the eggs so delivered.

Has the railroad estopped itself from recovering from the defendant?

It is of no moment that the defendants notified Nice and Schreiber not to pay the draft already paid by them, or that the railroad took an agreement of indemnity from Nice and Schreiber. If the defendants were prejudiced by the misdelivery, the doctrine that when a loss has happened which must fall on one of two innocent persons, it must be borne by the one who has occasioned the loss, would have application; for instance, had the defendants, before they discovered the eggs belonged to Nice and Schreiber, paid Emerson and Overstreet for the eggs, or incurred some expense or assumed some liability on the faith of the delivery.

No such thing happened. It appears, however, that Emerson and Overstreet were at the time indebted to the defendants in the sum of $1365.08, which debt the defendants deducted from the proceeds of the sale of the 229 cases of eggs, viz., $1493.08, and mailed a check for the difference to Emerson and Overstreet, who shortly thereafter became bankrupt.

All this was done by the defendants with full knowledge of the rights of Nice and Schreiber and the railroad.

The defendants parted with nothing on the faith of the railroad's mistake; certainly the attempted payment by the defendants of their past-due claim against Emerson and Overstreet does not constitute them a purchaser or holder for value: Callendar v. Kelly, 190 Pa. 455, 464, and Raken v. Henry, 16 Dist. R. 207. To hold otherwise would permit the defendants to satisfy their claim out of the property of Nice and Schreiber without any equity to justify it. The defendants have failed to show that the railroad is estopped from maintaining its suit.

Is there any reason why judgment should not be entered for the plaintiff? The facts as we have stated them are practically admitted by the defendants, except they contend that the draft on Nice and Schreiber was paid on March 7, 1922, and not Feb. 28, 1922. There is no basis for this contention. The draft itself was endorsed as paid on Feb. 28, 1922, by the Federal Reserve Bank. The books and canceled checks of Nice and Schreiber show the same thing, and all these documents support the testimony of the officers and employees of Nice and Schreiber, who testified that the draft was paid on Feb. 28, 1922.

The defendants offered no testimony as to when the draft was paid except the testimony of a former employee of the Federal Reserve Bank, who testified it was paid on Feb. 28, 1922.

Ordinarily, the credibility of a witness is a question for the jury (Bank v. Donaldson, 6 Pa. 179), and this is true though his testimony be uncontradicted: Sorensen v. Quaker City Poster Adv. Co., 284 Pa. 209, and McGlinn Distilling Co. v. Dervin, 260 Pa. 414.

Here, the date of the payment of the draft is proved overwhelmingly, not only by the uncontradicted testimony of witnesses, but by independent documentary evidence without the slightest reason to doubt the evidence. In such a case the court is justified in directing a verdict: Lonzer v. Lehigh Valley R. R. Co., 196 Pa. 610; Catasauqua National Bank v. Miller, 60 Pa. Superior

Ct. 220; Second National Bank v. Hoffman, 233 Pa. 390, and Walters v. American Bridge Co., 234 Pa. 7.

There is no merit in the defendants' contention that certain telegrams they offered in evidence raise a doubt as to when the draft was paid. Neither the plaintiff nor Nice and Schreiber received, or were parties to, the telegrams. They passed between other parties. It is questionable whether they were admissible, but, apart from this, they all relate to drafts drawn on the defendants. If any of the telegrams refer to the draft alleged to have been drawn on the defendants for the eggs in question, it was not paid by the defendants.

The plaintiff claims the value of the eggs delivered to the defendants was $1683, while the defendants admit they received $1493.08 net on their sale.

At the argument, the plaintiff stated it was willing to accept the defendants' value. In view of this stipulation, it would be idle to grant a new trial to have a jury fix the value of the eggs. We think judgment should be entered for the plaintiff.

And now, to wit, Feb. 26, 1927, judgment is entered for the plaintiff n. o. v. in the sum of $1493.08, with interest from March 3, 1922. Exception to the defendants.

Plaintiff's rule for a new trial is discharged.