## Bradley et al. v. Illinois Cent. R. Co.

June 2, 1942.

26

Boyd & Boyd for appellants.

McMurry & Shoup for appellee.

OPINION OF THE COURT BY JUDGE REES—Affirming.

Henry Bradley, doing business under the firm name of Bradley Bros., was a dealer in flour, feed, and coal in Paducah, Kentucky, in January, 1937, when the transaction occurred out of which this litigation arose. In the summer of 1936 he entered into two contracts with the Wilson Flour Mills of Wilson, Kansas, for the purchase of a large quantity of flour to be delivered from time to time in carload lots on the purchaser's order. On January 16, 1937, he directed the Wilson Flour Mills to ship a carload of flour under the contracts theretofore made, and the flour was shipped on that day and arrived in Paducah on January 18, 1937, or early in the morning of January 19th. The car containing the flour was placed on a sidetrack which extended along and adjoined Bradley's warehouse. A few days thereafter the warehouse burned. The car was burned, and the flour was destroyed. The shipment was made on what is known as a "to-order" bill of lading; that is, Wilson Flour Mills consigned the flour to itself at Paducah with the notation: "Notify Bradley Bros." The original bill of lading was attached to a draft for $1,009.59, the contract price of the carload of flour, and sent to a Paducah bank. This was in accordance with the custom under which previous shipments had been made. The bank, upon receipt of the draft with bill of lading attached, would notify Bradley Bros. who would pay the draft, obtain possession of the bill of lading and then surrender it to the railroad company in exchange for the car of flour. In order to obviate the delay in the delivery of the goods shipped on "to-order" bills of lading, sometimes occasioned by delay in receipt of bills of lading sent through banking channels, the Illinois Central Railroad Company, in 1933, agreed with several Paducah merchants, including appellant, who received so-called "to-order" shipments, to deliver shipments without requiring the surrender of the bills of lading provided the merchants furnished the railroad bonds to protect it from loss re-

sulting from its delivery of shipments without requiring surrender of the bills of lading. On May 5, 1933, appellant, as principal, and the Fidelity & Casualty Company of New York, as surety, executed and delivered to the Illinois Central Railroad Company a bond styled "Blanket Indemnity Bond Covering Freight Delivered Prior To Surrender of 'Order' Bills Of Lading Or Delivery Orders." The bond recites that in the course of the business of the principal at Paducah, Kentucky, goods moving on "order" bills of lading may arrive from time to time over the lines of the Illinois Central Railroad Company for which, at the time or times of arrival of such goods, the principal may be unable to produce and surrender the proper bills of lading, and the principal is desirous of securing from the railroad company delivery of the goods without waiting for the arrival and surrender of the bills of lading. The bond provides that if the railroad shall deliver to Bradley Bros. freight without prior production and surrender to the railroad of bills of lading, Bradley Bros. will produce and surrender such bills of lading to the railroad company within five days after such delivery, and upon its failure so to do Bradley Bros. and its surety agree to indemnify and save the railroad harmless from loss, cost, expense, etc., arising directly or indirectly or growing out of such delivery of such freight without the production and surrender of bills of lading. On December 3, 1937, the Illinois Central Railroad Company brought this action against Henry L. Bradley and the Fidelity & Casualty Company of New York on the blanket bond executed by them in 1933. The plaintiff alleged in its petition that in consideration of this bond it delivered to Henry L. Bradley on January 19, 1937, a shipment of flour without requiring surrender of the bill of lading, and that the defendant did not within five days, or at all, deliver to plaintiff the bill of lading covering the shipment, and plaintiff was required to and did pay to the consignor of the flour the value thereof, to wit, $1,009.59. The defendant denied that he was notified of the arrival of the shipment or that it was ever delivered to or received by him. He also defended on the ground that the bond executed by him in 1933 violated certain rules promulgated by the Interstate Commerce Commission, and could not be relied upon by plaintiff, and, further, that plaintiff was negligent in spotting the car on the sidetrack alongside defendant's warehouse when the water was rising rapidly in the Ohio

river. The circuit court submitted the case to the jury on the issue of notice and delivery, and the jury returned a verdict for the plaintiff. Judgment was rendered against the defendant Bradley for the sum of $1,009.59 and against the defendant Fidelity & Casualty Company of New York for the sum of $1,000, that being the amount of the bond.

The proof for the railroad company shows that it was Bradley's uniform custom to accept delivery of carloads of flour on the siding alongside his warehouse. When the car in question arrived in Paducah, C. H. Rhodes, the car service clerk of the railroad, received the waybill and he called Bradley's office by telephone. Someone in the office answered the telephone, and Rhodes notified him of the arrival and contents of the car, the car number, and the point of origin of the shipment. This was on January 18th or 19th, 1937. Rhodes directed that the car be placed on the siding at Bradley's warehouse where carload lots of flour consigned to Bradley were always delivered. W. H. Rayburn, employed by the railroad company as yard checker and whose duty it was to visit all places of business of consignees where cars were placed for unloading and to make a record of the cars spotted on sidings for the purpose of keeping the demurrage record, testified that he visited Bradley's place of business about 8:30 a. m. on January 20, 1937, and found the car of flour on the siding. The car was spotted so that the door of the boxcar opened opposite the door of the warehouse. On the same siding and coupled to the car of flour were two cars of coal. He checked the same three cars at the same location on January 21st and January 22nd. On one of his visits he saw a man unloading one of the coal cars. There was no water on the tracks on January 22nd, but the Ohio river was rising rapidly and on January 23rd the tracks were covered with water and the checking of cars was discontinued until the water receded. Bradley denied that he received any notice by telephone of the arrival of the car of flour either on the 19th or 20th of January, and he stated that he and his bookkeeper and office assistant, W. D. Carney, were the only persons working in the office on those days. He did not know of the presence of the car of flour on the siding until he saw it after it had burned on February 1, 1937. He admitted he knew the coal cars were on the siding and he was having them unloaded. He continued transacting business at his ware-

house through January 22nd, but on the 23rd the Red Cross took charge and used the warehouse for housing refugees. W. D. Carney testified that he did not receive notice by telephone on January 19, 1937, of the arrival of the car of flour, and first learned of its presence on the siding after the fire. He first denied knowledge of the presence of the coal cars on the siding, but later admitted he knew they were there.

The competency of the testimony of Rhodes concerning the telephone conversation is questioned on the ground that the witness did not claim he recognized the voice of anyone in the office and was not given the name of the person with whom he was talking. It is argued that with this testimony eliminated there was not sufficient evidence to take the case to the jury on the question of notice and delivery. The admissibility of such testimony was recognized in Potomac Insurance Co. v. Armstrong, 206 Ky. 434, 267 S. W. 188. One of the earliest, as well as one of the leading, cases on the question is Wolfe v. Missouri Pacific Railway Co., 97 Mo. 473, 11 S. W. 49, 51, 10 Am. St. Rep. 331, 3 L. R. A. 539, wherein the court said:

"A question arose incidentally at the trial upon the admission in evidence of a conversation held through the telephone between some one at the instrument in plaintiffs' private office and the witness. It was admitted, though the witness did not identify the voice of the speaker as that of either of the plaintiffs or their clerk. The courts of justice do not ignore the great improvement in the means of intercommunication which the telephone has made. Its nature, operation, and ordinary uses are facts of general scientific knowledge, of which the courts will take judicial notice as part of public contemporary history. When a person places himself in connection with the telephone system through an instrument in his office, he thereby invites communication in relation to his business through that channel. Conversations so held are as admissible in evidence as personal interviews by a customer with an unknown clerk in charge of an ordinary shop would be in relation to the business there carried on. The fact that the voice at the telephone was not identified does not render the conversation inadmissible. The ruling here announced is intended to determine

merely the admissibility of such conversations in such circumstances, but not the effect of such evidence after its admission. It may be entitled, in each instance, to much or little weight in the estimation of the triers of fact, according to their views of its credibility, and of the other testimony in support or in contradiction of it.''

This rule is supported by the weight of authority. 20 Am. Jur., Evidence, Section 367; 31 C. J. S., Evidence, Section 188; Wigmore's The Science of Judicial Proof, 3rd Ed., Section 227; Annotations in 71 A. L. R. 13, and 105 A. L. R. 330. Aside from the testimony of Rhodes concerning the telephone conversation, there was evidence sufficient to take the case to the jury on the question of notice. The undisputed evidence shows that the car of flour was on the sidetrack at Bradley's place of business for at least three days before business at the warehouse was suspended on account of the flood water, and that two cars of coal which were coupled to the car containing the flour were being unloaded by appellant Bradley. He had ordered shipment of the flour on January 16th, it had arrived on January 18th or 19th, and, certainly, he must have expected its arrival before the 22nd.

Appellants, in advancing the argument that the bond executed by them and conditioned that the consignee would hold the carrier harmless from loss if the carrier would deliver freight to the consignee without requiring prior surrender of the bill of lading is unenforceable because in conflict with the terms of the bill of lading and with a rule promulgated by the Interstate Commerce Commission, overlook two facts: (1) The stipulation in the bill of lading requiring its surrender upon delivery of the property is for the benefit of the carrier, Pere Marquette Railroad Co. v. J. F. French & Co., 254 U. S. 538, 41 S. Ct. 195, 65 L. Ed. 391; and (2) the rule of the Interstate Commerce Commission, which provides that the surrender of the bill of lading is required before delivery of the property, also provides that if the bill of lading be lost or delayed the property may be delivered in advance of the surrender of the bill of lading. The rule relied upon reads:

''The surrender of the carrier's original order bill of lading, properly endorsed is required before delivery of the property, but if such a bill of lading

be lost or delayed, the following will govern: The property may be delivered in advance of the surrender of the bill of lading upon receipt of the carrier's agent of a certified check for an amount equal to 125% of the invoice or value of the property or at the carrier's option, upon the receipt of a bond, acceptable to the carrier, in an amount for twice the amount of the invoice or value of the property, or a blanket bond may be accepted when satisfactory to the carrier as to surety, amount and form.''

The fact that a blanket bond is provided for indicates, it was the purpose of the rule to enable carriers and shippers to arrange for prompt and orderly delivery of freight shipped on ''to-order'' bills and to avoid the delay, though sometimes slight, inevitable in the case of every such shipment where the consignee must pay the draft at the bank, procure the bill of lading, and deliver it to the carrier after he receives notice of the arrival of the goods. Blanket bonds similar to the one here involved are uniformly enforced by the courts. Northwestern Casualty & Surety Co. v. Illinois Central Railroad Co., 7 Cir., 19 F. (2d) 868; Chicago, B. & Q. Railroad Co. v. Vander-Boom, Mo. App., 30 S. W. (2d) 186.

Appellants insist that the court erred in failing to instruct upon the negligence of the railroad company in delivering the car of flour in Paducah just prior to the 1937 flood when most of the business section of Paducah was under water. There was no issue on this point. If delivery was made it was made several days before the flood, and the consignee had ample time in which to unload the car. The instructions tersely and concisely presented the question of notice and delivery, and that was the only issue in the case.

Judgment is affirmed.