**Reading Company v. United States Fidelity & Guaranty Company**

*William P. Quinn,* for plaintiff.

*Turrey A. Kepler* and *Rudolph J. DiMassa,* for defendent.

HIRSH, J., March 19, 1973.—This is a suit by a common carrier on a blanket indemnity bond for a combined loss and outstanding liability of some $40,000 representing the invoice prices of seven carload shipments of flour, plus various expenses and charges. Upon a record which includes plaintiff's second amended complaint, defendant's answer and new matter, plaintiff's reply thereto and depositions, we find no material issue of fact as to liability or damages and so enter judgment in the amount claimed upon plaintiff's motion under Pennsylvania Rule of Civil Procedure 1035.

The bonding instrument itself is entitled "Blanket Indemnity Bond for Delivery of Order or Straight Consignments Prior to Surrender of Original Bills of Lading and/or Other Documents." In accordance with a uniform tariff on file with the Interstate Commerce Commission, plaintiff was authorized to make delivery of the types of shipments involved here to persons who state they are entitled to possession of the goods, that the delivery order or other appropriate documents are not immediately available and who present the carrier with a bond of this

type. Plaintiff delivered the flour in this manner; the recipient, despite demand, failed to produce the necessary documents or to make payment and, thus, plaintiff became liable to the two originators of the shipments, Pillsbury and General Mills, having breached its contract of carriage with them.

The contention that the bond did not cover all seven shipments must be rejected. Western Flour Company was the named principal in the bond. The deposition of its president, D'Onofrio, establishes that he is also president of Rugdon Company, apparently the ultimate recipient of one shipment, which, in fact, shared offices with Western. The deposition also establishes that Miss Gagliardi, an agent and officer of Western (the principal), actually made each delivery request, and that Western "handled" deliveries for Rugdon (and two other companies) and possessed the one warehouse into which all shipments were delivered. Although it was claimed in the depositions that storage of Western's flour was kept separate from Rugdon's, and also from American Flour Company's, deponent, referring to Miss Gagliardi, stated that she, in presenting the railroad with a demand for delivery of a shipment ". . . might have used, you know, the Western Flour letterhead and many times she didn't know who they belonged to because in many cases it was she who went just by the car number." The deposition overall shows that in addition to the interrelationship of these companies, Western, in dealing with the railroad, made no effort to distinguish between the different ultimate recipients. Indeed, by its conduct, including the presentment of the bond itself naming Western as sole principal, it established itself, vis-a-vis plaintiff, as the "party . . . lawfully entitled to the possession of the property," in

the words of the tariff: Rule 7, sec. 4, Uniform Freight Classification No. 8.

Simply put, its agent having secured delivery by means of a bond naming it as principal, Western could not be heard to deny its status as recipient or responsible and liable for receipt of the goods, on basic estoppel principles. Therefore, neither can defendant, which by reason of the bonding obligation stands in Western's shoes.

The deposition also establishes that Western never received bills of lading or equivalent documents and the record further makes out beyond question the ingredients of demand, nonpayment by Western or other recipients, payment by plaintiff of invoice amounts and existing liability for court costs, attorneys' fees, etc., in connection with the Pillsbury claim. Clearly, plaintiff had no defense to the Pillsbury and General Mills claims, and the assertion that the judgment secured by Pillsbury against the Reading Company was somehow prejudicial to defendant or in bad faith because it was by default, is of no merit. The railroad had no defense and no ability to prevent Pillsbury from initiating the action. The $800 plus in expenses are apparently not unreasonable and certainly subject to the bonding obligation to indemnify against "all claims and demands whatsoever, . . . together with all loss, damage and expense whatsoever, either direct or indirect . . ."

Defendant asserts that the railroad should have insisted on production of the documents, but the bond is itself an expressly designed mechanism to enable delivery of goods in the absence, by reason of loss, late delivery or whatever, of documents to facilitate the flow of commerce and for which defendant presumably received its premium. Plaintiff seeks recovery for the very event contemplated by the obligation.

480

Plaintiff's liability to Pillsbury and General Mills is likewise beyond question: Pere Marquette Ry. v. French & Co., 254 U.S. 538 (1921). Apart from common-law liability for breach of its contract of carriage, plaintiff became liable under section 20(11) of the Interstate Commerce Act, 49 U.S.C. §20(11), to the shippers who had issued the bills to themselves: Capitol Packing Co. v. Smith, 270 F. Supp. 36 (1967), affirmed sub. nom., Consolidated Packing Co. v. Capitol Packing Co., 389 F. 2d 505 (1968). There is no basis for considering plaintiff a volunteer.

The record contains no *factual* denials or contradictions of the material facts pleaded, and the deposition evidence is that of an adverse party, Western, equally liable to plaintiff along with the surety, which, being similarly uncontradicted, is the type of evidence which "may afford a sound basis for summary judgment": 1 Goodrich-Amram Civil Practice 336.

Accordingly, it is, therefore, ordered and decreed that a summary judgment shall be entered in plaintiff's favor and against defendant, United States Fidelity & Guaranty Company, for the relief demanded in the complaint.