THE ELGIN MILLS, INC., A CORPORATION, APPELLANT, V. CHICAGO AND NORTH WESTERN RAILWAY COMPANY, A CORPORATION, APPELLEE.

128 N. W. 2d 384

Filed May 15, 1964.  No. 35639.

Marti, O'Gara & Dalton and Harold Rice, for appellant.

Gaines, Spittler, Neely, Otis & Moore, for appellee.

Heard before WHITE, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

CARTER, J.

This is an action by The Elgin Mills, Inc., against the Chicago and North Western Railway Company for the value of a carload of vetch seed which was allegedly converted by the railroad's connecting carrier by delivering the vetch seed to the Rudy-Patrick Seed Company at Kansas City, Missouri, without the surrender of the order bill of lading properly endorsed. The defendant admits that the car of vetch seed was delivered to the Rudy-Patrick Seed Company without the surrender of the bill of lading. It alleges that the delivery was made pursuant to the directions of the plaintiff, that the delivery was ratified by the plaintiff, and that no loss resulted to the plaintiff because of the delivery without the surrender of the order bill of lading. Plaintiff's reply was a general denial. A jury was waived and trial had to the court. The trial court found for the defendant and dismissed the action. Plaintiff has appealed to this court.

The evidence shows that Lambert H. Vanderheiden was the president of The Elgin Mills, Inc. We shall refer to him as Vanderheiden. Eugene B. Mangelsdorf is the vice president and secretary of Rudy-Patrick Seed Company and will hereafter be referred to as Mangelsdorf. The defendant will be referred to as the railroad company. The Rudy-Patrick Seed Company will be designated as Rudy-Patrick. The Elgin Mills, Inc., will be designated as Elgin Mills. The authority of Vanderheiden and Mangelsdorf to represent their respective companies is not questioned.

In July 1960, Elgin Mills shipped a carload of vetch seed from Elgin, Nebraska, to Elgin Mills, Omaha, Nebraska, on a shipper's order bill of lading. Vanderheiden explained that this was the first carload of vetch seed

of the season and he had not found a purchaser, which he expected to do while the car was enroute. He took the original bill of lading from the agent at Elgin, Nebraska, and retained it continuously to the time of trial. He immediately undertook by telephone to find a buyer, but had been unable to do so by the time the car arrived in Omaha. He tried to sell the vetch seed to Rudy-Patrick, but was unable to do so. He did make an agreement with Mangelsdorf that Rudy-Patrick would accept the vetch seed, unload it, test it as to percentage of germination, and thereafter attempt to agree upon a sale price. In the event they could not agree on a price, Mangelsdorf agreed to reload the vetch seed for 25 cents per hundred pounds at Vanderheiden's direction. When the railroad agent in Omaha requested instructions as to the disposition to be made of the carload of vetch seed upon its arrival in Omaha, Vanderheiden directed the local agent to divert the car to Rudy-Patrick in Kansas City. The railroad company diverted the car as directed over the Missouri Pacific railroad, which delivered the car to the Frisco Railroad in Kansas City. The Frisco Railroad delivered the car to the warehouse of Rudy-Patrick and it was unloaded on August 15, 1960.

The original order bill of lading was dated July 22, 1960. The carload of seed arrived in Omaha on or about July 28, 1960, and arrived in Kansas City on August 7, 1960, on which date, or soon thereafter, it was delivered on track at the Rudy-Patrick warehouse. The instructions of Vanderheiden to the local agent, which were forwarded to the agent at Omaha, did not change the nature of the shipper's order bill of lading as originally issued. Through an error in Omaha the car was diverted to Kansas City on open bill and not on shipper's order in accordance with the original bill of lading. As a result of the error the car was delivered to Rudy-Patrick without the surrender of the

order bill of lading, which still remained in the possession of Elgin Mills.

The evidence is clear that Elgin Mills and Rudy-Patrick had many transactions with each other prior to the one before the court. Vanderheiden and Mangelsdorf had many telephone conversations before and after the delivery of the carload of seed. Both admit that the car was diverted to Rudy-Patrick as the result of a mutual agreement by telephone that Rudy-Patrick would accept the car of seed, unload it in its warehouse, test it as to purity and germination qualities, and then attempt to agree upon a sale price. If a sale price could not then be agreed upon, Mangelsdorf agreed to reload the seed for 25 cents per hundredweight, subject to shipping instructions by Vanderheiden.

On September 21, 1960, Vanderheiden and Mangelsdorf had a telephone conversation about which there is some divergence in the evidence. Vanderheiden testified that they discussed the result of the tests and the value of the seed. He said they could come to no agreement on price and he directed Mangelsdorf to reload the seed in accordance with their previous agreement, and Mangelsdorf informed him that he would not do so.

Mangelsdorf's version of the conversation was to the effect that they discussed the seed tests and that he informed Vanderheiden the seed was worth $8.50 to $9 per hundredweight and that he finally offered to take the seed at $9.25 per hundredweight. He said that Vanderheiden accepted the offer. They then discussed some claims which Rudy-Patrick had against Elgin Mills for excess payments on previous grain shipments where the grain was below standard, and for sacks and testing equipment in the possession of Elgin Mills, which belonged to Rudy-Patrick. Mangelsdorf said he told Vanderheiden he would deduct these claims from the sale price of the vetch seed. He stated that Vanderheiden offered to allow a credit of $1,000 on the purchase price of the seed and leave the balance to arbitra-

tion. Mangelsdorf refused this counteroffer and insisted he would deduct the whole of the off-setting claims. Vanderheiden refused and directed Mangelsdorf to reload the seed and he would furnish shipping directions. Mangelsdorf then told Vanderheiden that he would not reload the seed. Mangelsdorf said that Vanderheiden then told him for the first time that he held a shipper's order bill of lading and that he would send it through with sight draft attached. Vanderheiden did not deny Mangelsdorf's evidence as to the sale of the seed, or regarding the claims of Rudy-Patrick against Elgin Mills. In fact, he did not testify at all after Mangelsdorf's deposition was offered in evidence.

Mangelsdorf further testified that Rudy-Patrick was ready to pay $9.25 per hundredweight for the seed, less the amount of its claims against Elgin Mills, provided the original shipper's order bill of lading was surrendered or otherwise adjusted.

It is on this state of facts that the railroad company contends the carload of vetch seed was delivered to one entitled to possession, that the delivery was ratified by Elgin Mills, and that the loss was not the result of the improper delivery of the car of vetch seed to Rudy-Patrick.

It is not disputed that the railroad company is primarily liable as the initial carrier for a wrongful delivery of the carload of seed. Title 49, U. S. C. A., § 20 (11), p. 114. It is provided by Title 49, U. S. C. A., § 88, p. 488, that a carrier, in the absence of lawful excuse, is bound to deliver goods upon demand made by the consignee named in the bill of lading or, if the bill is an order bill, by the holder thereof, if such demand is accompanied by possession of the bill of lading and a good faith offer to surrender such bill properly endorsed. The railroad company admits that the vetch seed was delivered without the surrender of the order bill of lading properly endorsed.

The railroad company alleges that it was justified in

delivering the seed to Rudy-Patrick, a party entitled to the possession of the goods, in accordance with Title 49, U. S. C. A., § 89, p. 492. It is not disputed that under the provisions of the foregoing sections of the Uniform Bill of Lading Act the railroad company is liable in conversion for the delivery of goods without the surrender of the order bill of lading properly endorsed, except where the delivery was justified as provided by Title 49, U. S. C. A., § 89, p. 492. The primary issue is whether or not the misdelivery is justified by the provisions of the Uniform Bill of Lading Act.

Elgin Mills shipped the seed on an order bill of lading which contained the statement "Deliver only upon surrender of original B/L properly endorsed." In directing the diversion of the seed to Rudy-Patrick, Elgin Mills did not authorize any change in the order bill of lading other than the change of the name of the consignee. Through a mistake by the railroad company the seed was delivered on a waybill indicating the delivery was to be made as if under an open bill. This was a misdelivery through error on the part of the railroad company and amounts to a conversion of the seed unless the delivery was justified within applicable provisions of the federal Uniform Bill of Lading Act.

The railroad company asserts that the delivery was justified under the facts shown by the evidence. The railroad company argues that Elgin Mills directed it to deliver the seed to Rudy-Patrick, when it had the order bill of lading in its possession, consistent with an agreement between Elgin Mills and Rudy-Patrick that the latter would unload the seed, test it, attempt to agree on a price, and, in case of a failure of sale, would reload the seed. It contends also that the seed was delivered and retained by Rudy-Patrick from August 15, 1960, to September 21, 1960, with the consent and approval of Elgin Mills and, only after negotiations for the sale of the seed to Rudy-Patrick failed, Elgin Mills attempted to assert a misdelivery and hold the railroad company for conver-

sion. It is the position of the railroad company that Elgin Mills not only authorized the delivery to a person entitled to possession, but also ratified the misdelivery, and that any loss sustained by it is due to the violation of Rudy-Patrick's agreement to reload the seed and not because of the misdelivery of the seed.

Elgin Mills insists that Rudy-Patrick was not a person lawfully entitled to the possession of the seed and points out that the railroad company was not obliged to deliver the seed, except on surrender of the order bill of lading properly endorsed, but that it was not prohibited from doing so, citing Pere Marquette Ry. Co. v. French & Co., 254 U. S. 538, 41 S. Ct. 195, 65 L. Ed. 391. We quite agree with Elgin Mills that the delivery was made at the peril of the railroad company. The decision rests on the question of whether or not Rudy-Patrick was entitled to possession of the seed.

We conclude at the outset that Elgin Mills did not specifically authorize a delivery of the seed in violation of the contract of carriage represented by the order bill of lading and that the delivery was made as if it was under an open bill of lading because of a mistake made by the railroad company.

The Elgin Mills cites cases in support of its theory, including Norfolk & Western Ry. Co. v. Aylor, 153 Va. 575, 150 S. E. 252; Davis v. Fruita Mercantile Co., 74 Colo. 247, 220 P. 983; Alderman Bros. Co. v. New York, N. H. & H. R.R. Co., 102 Conn. 461, 129 A. 47; and Griggs v. Stoker Service Co., Inc., 229 N. C. 572, 50 S. E. 2d 914, 15 A. L. R. 2d 798. We think these cases are clearly distinguishable on their facts.

We are of the opinion that the railroad company delivered the seed to a person lawfully entitled to the possession of the goods. In Pere Marquette Ry. Co. v. French & Co., *supra,* the court said: "Although there is a conflict of language in the cases in which a shipper sues a carrier for delivery of goods without requiring a surrender of the bill of lading, there appears to be

no conflict of principle or in decision. Where the failure to require the presentation and surrender of the bill is the cause of the shipper losing his goods, a delivery without requiring it constitutes a conversion. (Citing cases.) But where delivery is made to a person who has the bill or who has authority from the holder of it, and the cause of the shipper's loss is not the failure to require surrender of the bill but the improper acquisition of it by the deliveree or his improper subsequent conduct, the mere technical failure to require presentation and surrender of the bill will not make the delivery a conversion. (Citing cases.) * * * Similarly, in the case before us, the failure of the carrier to require production and surrender of the bill of lading did not cause the loss. The same loss would have resulted if the bill had been presented and surrendered. The real cause of the loss was the wrongful surrender of the bill of lading by the Indianapolis bank to Marshall & Kelsey by means of which the car was taken to Camp Zachary Taylor and the shipper deprived of the Louisville market. Nor did the failure to take up the bill enable the buyer to throw back the loss upon the shippers. The shippers deliberately assumed the loss by their voluntary act in taking back the draft and the bill of lading which they had sold to the Grand Rapids Bank. * * * Having assumed the loss of their own volition they should not be permitted to pass it on to the carrier merely because of its technical failure to take up the bill of lading."

In Kemper Mill & Elevator Co. v. Hines, 293 Mo. 88, 239 S. W. 803, the court stated the principle in the following manner: "Consequently, where the goods are deliverable by the bill to the order of the consignor as in this case, the consignor could authorize his agent to receive the goods for him, without surrendering the bill, as long as he is the holder of the bill, and the delivery would be a legal delivery as between him and the carrier, no rights of third party intervening."

In Stanchfield Warehouse Co. v. Central R.R. of Oregon, 67 Or. 396, 136 P. 34, the court in a similar case said: "If the plaintiff consented to or authorized said delivery, or ratified it after having knowledge that it had been made, it could not maintain an action against the defendant for making such delivery. Its previous consent to such delivery or its subsequent ratification thereof would constitute a complete bar to such an action." See, also, Carter v. St. Louis-San Francisco Ry. Co., 179 Ark. 865, 18 S. W. 2d 376; Turner Lumber & Investment Co. v. Chicago, R. I. & P. Ry. Co., 223 Mo. App. 564, 16 S. W. 2d 705.

In the instant case there had been no sale of the seed to Rudy-Patrick. The agreement between Elgin Mills and Rudy-Patrick did not contemplate payment before delivery. The very purpose of the agreement was the delivery of the seed to Rudy-Patrick for the purpose of testing, and a future possible sale of the seed to the seed company. The order bill of lading was at all times in the possession of Elgin Mills, consequently the rights of a third party were not, and could not have been, involved. Elgin Mills is in no position to assert damage for misdelivery since its agreement with Rudy-Patrick was not one for sale and payment, but for unloading and testing, and a possible future sale. Rudy-Patrick was entitled to the possession, not as buyer or owner, but for the purposes stipulated in the agreement between Vanderheiden and Mangelsdorf. The asserted damage by Elgin Mills would have occurred, whether or not the order bill of lading was surrendered, had delivery been made in accordance with the agreement between Vanderheiden and Mangelsdorf. The delivery of the seed to Rudy-Patrick was in accordance with the instructions of the owner in possession of the order bill of lading, and the failure of the railroad company to demand the order bill of lading before delivery was not the cause of the loss. The loss is due solely to the breach of the agreement by Rudy-Patrick to reload the seed

and return it to the possession of Elgin Mills. Rudy-Patrick was clearly entitled to the possession of the seed by agreement with the owner without paying for it, although the possession was for a limited purpose.

The case was tried to the court, a jury being waived. The judgment of the trial court has the effect of a verdict of a jury which will not be set aside unless clearly wrong. The judgment of the district court is sustained by the evidence and the applicable law. The judgment is affirmed.

AFFIRMED.