**CHILEWICH PARTNERS, Plaintiff,**

v.

**M.V. ALLIGATOR FORTUNE, M.V. WESTWOOD MARIANNE, M.V. EIBE OLDENDORFF, M.V. HANJIN SEOUL, M.V. ARTHUR MAERSK, M.V. PRESIDENT JOHNSON, M.V. HENRY HUDSON BRIDGE, M.V. GEORGE WASHINGTON BRIDGE, M.V. MANHATTEN BRIDGE, M.V. CALIFORNIA HERMES, M.V. CALIFORNIA JUPITER, their respective engines, boilers, etc., Mitsui O.S.K. Lines, Ltd., Westwood Shipping Lines, Inc., Hanjin Shipping Co., Ltd., Sea–Land Service, Inc., American President Lines, Ltd., Kawasaki Kisen Kaisha, Ltd., Nippon Yusen Kaisha (NYK Line), Orange Container Carrier Co., Ltd., Hyundai Merchant Marine Co. Ltd., A/S D/S Svendborg & D/S AF 1912 A/S, Orion Shipholding S.A., Coiba Shipping S.A., Highness Maritime S.A., First Interstate Bank of California, and Seafarers Shipping Agency Inc., Defendants.**

No. 92 Civ. 0491 (CHT).

United States District Court,
S.D. New York.

June 2, 1994.

---

Donovan, Parry, Walsh & Repetto, New York City, for plaintiff; James F. Sweeney, John A.V. Nicolletti, Thomas M. Rittweger, of counsel.

Walker & Corsa, New York City, for defendants; Richard A. Corwin, Kirk M.H. Lyons, Leroy S. Corsa, of counsel.

## OPINION & ORDER

TENNEY, District Judge.

Plaintiff Chilewich Partners ("Chilewich"), a shipper of cattlehides, brings this action against six ocean carriers for the improper delivery of twelve shipments of wetsalted cattlehides. The carriers delivered the hides to two government bonded warehouses in South Korea belonging to Kyong Il Leather Co., Ltd. ("Kyong Il"), a leather tannery, in return for which Chilewich was to receive payment through letters of credit. Although the hides were delivered, payment was never received. At present, the hides are nowhere to be found. Presumably, Kyong Il wrongfully removed the hides from its warehouses. Chilewich argues, primarily, that the carriers improperly failed to obtain original bills of lading from Kyong Il before releasing the hides from container yards at the discharge port for delivery to Kyong Il's government bonded warehouses, and are therefore liable in conversion for the value of the hides.

Chilewich brings claims under the Pomerene Bills of Lading Act, 49 U.S.C.App. § 81

et seq., and the Harter Act, 46 U.S.C.App. § 190 et seq., as well as maritime law contractual claims. Claims against the carriers Hanjin Shipping Co., Ltd. and Highness Maritime S.A. were dismissed by stipulation on June 22, 1992. The in rem actions against the defendant vessels were also dismissed by stipulation. Remaining defendants are the ocean carriers Mitsui O.S.K. Lines, Inc. ("Mitsui"), Westwood Shipping Lines, Inc. ("Westwood"), Sea–Land Service, Inc. ("Sea–Land"), American President Lines, Ltd. ("APL"), Kawasaki Kisen Kaisha, Ltd. ("K–Line") and Nippon Yusen Kaisha, Ltd. ("NYK Line") (collectively, the "carriers").

On November 29 and 30, 1993, the court held a bench trial. For the reasons discussed below, the court finds for defendants and dismisses Chilewich's claims.

## BACKGROUND

Chilewich is a New York general partnership whose business is selling and shipping cattlehides to various Korean leather tanneries. Since its founding in 1989, one of Chilewich's largest Korean customers has been Kyong Il. Kyong Il is a large, publicly traded tannery with factories in Inchon and Ansan, Korea. Kyong Il maintains a Korean government licensed bonded warehouse on the premises of each of these tanneries. Joint Pre–Trial Order, Agreed Findings of Fact ("JPTO, FF") 1–3.

### A. The Stale Bill of Lading/Mill Delivery Transactions

In May, June and July, 1991, Chilewich shipped a total of 26,600 pieces of cattlehide to Kyong Il. The sales agreements between Chilewich and Kyong Il contained prices quoted on "CIF Inchon–Mill Delivery" terms and specified payment "by irrevocable Letter of Credit payable at sight in U.S. dollars against invoice and usual shipping documents.—STALE—."[1] Pl.Tr.Exh. 4A–4N.

---

1. For some of the shipments, the sales agreements between Chilewich and Kyong Il are evidenced both by a document on Chilewich stationary, addressed to Kyong Il in Korea, containing a description of the hides to be sold and the general terms and conditions of sale and by another

document, also on Chilewich stationary and addressed to Kyong Il, containing similar terms but stated differently. Although the documents bear identical dates, one is signed by Kyong Il and Kyungsong, Chilewich's agent in Korea, and one is not. The language quoted in this Opinion is

Evidence established that this transaction is a common one in the Korean hide trade and is known as a "stale" bill of lading transaction. Testifying at trial as to the meaning of a stale bill of lading transaction, Mr. David Peters, a partner at Chilewich during the events in question, stated:

> From [Chilewich's] point of view, [a stale bill of lading transaction] represents a transaction that would allow the cargo to be shipped to a government licensed warehouse in Korea. At which time, a letter of credit would be opened by the customer and then we would negotiate the letter of credit against various documents and the customer would get the goods.

Trial Transcript ("Tr.") 12. See also, Deposition of J.H. Lee (Assistant Manager at Kyong Il) at 94–95; Deposition of Arthur Anker (Partner at Chilewich) at 15. Concerning "mill delivery" terms, Peters stated:

> Mill delivery has become to mean where the cargo is placed in a designated warehouse or adjacent to the consignee or customer. However, it is our understanding that that location was licensed by the Korean government as a bonded warehouse.

Tr. at 12; Anker Dep. at 15–16. On cross-examination, Peters further discussed the nature of "stale" bill of lading transactions:

> Q: In terms of Chilewich's experience . . . wasn't it Chilewich's experience under stale bill of lading terms, mill delivery, Chilewich expected the shipment to go to the importer's self-use bonded warehouse and that some time after, it was in that self-use bonded warehouse, Chilewich expected a letter of credit to be opened up, all the while Chilewich holding original bills of lading?
>
> A: That's correct
>
> . . . .
>
> A: . . . as far as the payment condition, it was normally accepted that a stale bill of lading would mean payment anywhere from 15 to 30 days or sometimes 40 days after arrival at the government licensed bonded warehouse . . . there was a desire not to put into a contract the exact due date of when the letter of credit would be due.
>
> . . . .
>
> Q: And the common expectation also was at the time those shipments are at the self-use bonded warehouse, you will be holding the original bills of lading for some period of time until Kyong Il opens a letter of credit and then the bills of lading, together with other documents, are presented by Chilewich to get payment from the letter of credit, correct?
>
> A: Yes.

Tr. at 60, 61, 94.[2]

The cattlehides were shipped under sixteen negotiable bills of lading issued by seven

---

from the unsigned documents. While the signed ones would, barring indications of contrary intent, be binding, the unsigned documents may be considered to the extent that they illuminate the meaning of terms used in the signed ones. There being no indication or evidence that the difference in stating the essentially identical terms of the two documents was intentional, or was the result of a bargained exchange, it appears to the court that the purpose expressed in both documents is the same. Moreover, many of the contract files admitted as evidence lacked a signed document memorializing the sale between Chilewich and Kyong Il. Chilewich does not argue that the contracts, including those for which no signed agreement can be located, are not binding. On the signed agreements that were admitted, the price term states "C.I.F. Inchon [or Ansan] Mill Delivery Stale Basis;" the payment term states "By irrevocable Letter of Credit to be opened in our [Chilewich's] favor and payable at sight after presentation of shipping documents." See e.g., Def.Exh. E1 (Westwood).

2. On redirect examination, Mr. Peters equivocated somewhat:

> Q: What was your understanding as to that obligation [of the carriers toward the original bills of lading]?
> A: The original bills of lading were being held by us and we would tender those original bills of lading against the opening of the letter of credit.
> Q: And eventually what was your understanding at to what would become of the original bills of lading?
> A: They would be giving [sic] to, in this case, Kyong Il. Kyong Il would present them to the steamship line, and they would release the goods against presentation of the original bills of lading.

Tr. at 109. Confronted with these seemingly inconsistent responses, and with Mr. Peters further confusion on re-cross, in which he confessed to a lack of specific knowledge as to the mechanics of delivery in Korea, Tr. at 114, the court

different ocean carriers, six of whom are defendants in this action.[3] The bills of lading were consigned "TO THE ORDER OF SHIPPER" and Kyong Il was listed as "notify party." Pl.Tr. Exh. 1. The bills, with one exception, designated the place of delivery as "mill delivery."[4] This designation obligated the carriers to transport the hides to government bonded warehouses located at Kyong Il's factory premises in Inchon and Ansan, Korea. JPTO, FF 13.

### B. Arrival, Transport & Delivery of the Hides in Korea

As stated above, the cattlehides in the instant action, as with past cattlehide shipments by Chilewich to Kyong Il, were shipped on stale bills of lading with mill delivery terms. The carriers were obligated to deliver the hides to Kyong Il's government bonded warehouses; meanwhile, Chilewich was to retain the original bills of lading until Kyong Il established a letter of credit with a commercial bank, against which Chilewich could present a draft along with the original bills of lading in order to receive payment. JPTO, FF 25.

Shipment of cattlehides on stale bills of lading with mill delivery terms is a common practice in the Korean hide trade. JPTO, FF 26. The prevalence of this kind of transaction is likely facilitated by the control and oversight maintained by Korean customs officials over imported goods. Once arrived at a discharge port in Korea, imported goods are under the guidance and control of Korean customs officials, if not in their custody, until customs duties have been paid and the goods have been cleared through customs. See deposition of Mr. J.S. Kim, of the Importing section of the Seoul Customs Office, passim; J.H. Lee (Kyong Il) Dep. at 40; Young

Kueng Moon (Korean customs broker) Dep. at 15.

In a typical transaction, hides arriving in Korea are initially stored in container yards maintained by ocean carriers at the discharge port. The hides remain there until a bonded transportation license can be arranged and the hides delivered to a bonded government warehouse, usually operated on the premises of the importer. JPTO, FF 30. The "notify party," usually the importer, here Kyong Il, is notified when the hides arrive at the discharge port and prepares the bonded transportation license with necessary documents supplied by the carriers. Under customs regulations, only the consignee or a bonded transportation company with the consignee's authorization may apply for such a license. JPTO, FF 29. Korean customs looks upon the "notify party" as the consignee for purposes of the bonded transportation license. J.S. Kim (Customs Office) Dep. at 12. Once the importer presents the necessary documents to the customs authorities, the bonded transportation license issues. This license is necessary to transport imported goods from the discharge port to a government bonded warehouse. In fact, prior to the payment of customs duties and the clearance of the goods through customs, the goods may not be moved at all without a bonded transportation license, and even then, may only be moved from one government bonded warehouse to another. J.S. Kim (Customs Office) Dep. at 3–4; Young Keug Moon (Korean customs broker) Dep. at 15.

The bonded warehouses are licensed by the Korean government and, in this case, were located within Kyong Il's tannery premises adjacent to Kyong Il's leather processing facilities. JPTO, FF 18–21. The bonded warehouse, although maintained by the importer, is monitored by customs officials.

---

chooses to attach the greatest weight to his initial response as quoted in the Opinion. That response was corroborated by other testimony in this case, notably the deposition of Mr. J.H. Lee, manager of Kyong Il, and by what seems to have been the expectations of the parties as revealed by the correspondance between them. See e.g., Def.Exhs. D–W.

**3.** The seven ocean carriers are K–Line, Sea–Land, Mitsui, NYK Line, APL, Westwood and

Hanjin Shipping Co., Ltd.. Claims against Hanjin Shipping were dismissed by stipulation.

**4.** Of the twelve bills of lading covering the hides in suit, one, issued by the carrier K–Line, does not list a location under "place of delivery." Pl.Tr.Exh. 1C. However, no consideration is given to this omission in the court's analysis, inasmuch as neither of the parties attached any significance to what was likely an administrative error.

The warehouse manager, an employee of the importer, is trained by customs authorities. Customs officials share the keys to the warehouse with the importer. The goods must remain in the bonded warehouse, where they are inventoried and occasionally inspected by customs officials, until the importer pays customs duties. Under Korean customs law, the imported hides could not be removed from Kyong Il's government bonded warehouses for processing until customs duties had been paid and the hides cleared through customs. Tr. 222–223. It is a criminal offense in Korea for the importer to remove goods from the bonded warehouse before paying customs duties. See, J.H. Lee (Kyong Il) Dep. at 39–44; J.S. Kim (Customs Office) Dep. at 4, 5, 10.

In the instant case, the carriers notified Kyong Il when the hides arrived in Korea and Kyong Il, with the assistance of Kyungsong, Chilewich's Korean agent, assembled the documents needed to secure a bonded transportation license. Kyong Il presented the license to the carriers at their container yards, who, pursuant both to their carriage contracts with Chilewich and to Chilewich's sales contracts with Kyong Il, were to deliver the hides to Kyong Il's government bonded warehouses, thereby effecting "mill delivery." Kwang Tae Kim (Korean agent for Sea–Land) Dep. at 39; Kang Seok Han (Korean agent for NYK Line) Dep. at 10; Tai Hyun Lee (Korean agent for Mitsui) Dep. at 10–11.

Throughout the three month period during which the hides in this dispute were shipped, several of the defendant carriers expressed reservations about releasing the hides from their container yards without receiving either an original bill of lading, a bank guarantee (certifying that Kyong Il would be able to obtain letters of credit) or a letter of guarantee from the shipper, Chilewich. Korean

agents for the several of the carriers explained that these guarantees were sought to offset the risk that a third party would emerge with the original bills of lading, demanding release of the goods after they had been delivered to Kyong Il. Jae Choon Park (Korean agent for K–Line) Dep. at 67; Jeong Do Lim (Korean agent for Westwood) Dep. at 8; Jong Kyung Kim (Korean agent for K–Line) Dep. at 9. The carriers were also concerned about the importer's potential bankruptcy. Kang Seok Han (Korean agent for NYK) Dep. at 19. However, the carriers duty to effect "mill delivery" by releasing the hides for bonded transport to Kyong Il's government bonded warehouse existed independent of any guarantee. Yeong Suk Park (Korean agent for APL) Dep. at 14, 34. Tai Hyun Lee (Korean agent for Mitsui) Dep. at 17, 33.

The evidence also supports the carriers' argument that, although they requested release of original bills of lading in some cases, a stale bill of lading/mill delivery transaction was commonly understood not to require presentation of an original bill of lading before delivery to the importer's "mill." J.H. Lee (Kyong Il) Dep. at 94–95; Kwang Tae Kim (Korean agent for Sea–Land) Dep. at 38; Jae Choon Park (Korean agent for K–Line) Dep. at 24; Tai Hyun Lee (Korean agent for Mitsui) Dep. at 14; Kang Seok Han (Korean agent for NYK) Dep. at 14; Yeong Suk Park (Korean agent for APL) Dep. at 8–9; 54.

In fact, as is apparent from the copious telexes engendered by this controversy, Chilewich not only expected, but actually urged the carriers to make delivery without insisting on guarantees or the production of original bills of lading. See, e.g., Def.Exhs. C, L, X, E1, H1, X1, J2 (Chilewich contract files for the disputed shipments), Z, B1, C1 (Kyungsong & Chilewich faxes).[5] Apparent-

---

5. For example, Def.Exh. L is a letter on Chilewich stationary from Lorraine Breen, traffic manager at Chilewich, directed to Ms. Carrie Marcinko, of K–Line, and referencing the K–Line bills of lading in suit. The letter is dated July 8, 1991, and the body of the letter states, in part:

This letter is to confirm our numerous conversations and our fax dated July 1, 1991 from our agent in Korea, *stressing how important it is that these containers be delivered to the cus-*

*tomers Bonded Warehouse....* please be advised you are now facing additional expenses of over $9,000 dollars if containers are brought into the Busan Warehouse *since bill of lading states place of delivery "Inchon Mill."* We therefore, hold "K" Line America fully responsible for any and all storage/demurrage/stevedore charges accrued due to the delay or improper delivery of these containers....

ly, in the heat of negotiations, Kyungsong, acting without Chilewich's knowledge, actually did issue guarantees to some of the carriers to ensure prompt delivery of the hides. Yeong Suk Park (Korean agent for APL) Dep. at 40; Tai Hyun Lee (Korean agent for Mitsui) Dep. at 20. While the plaintiff makes much of what it terms this exchange of "secret" letters of guarantee, the court believes that the carriers were obligated to deliver the hides without original bills of lading even in the absence of any guarantee.

### C. Carriers' Delivery Obligations under the Bills of Lading

■ There are marked differences among the contracts of carriage used by the six defendant carriers with respect to their delivery obligations. However, only APL specifically requires surrender of the "original, properly endorsed bills of lading" before delivery. Pl.Tr.Exh. 1. Of the others, three—K–Line, NYK Line and Mitsui—contain the following language:

> the Carrier shall have the right to deliver the Goods at any time from the Vessel's side, custom house, warehouse, wharf, quay or any other place designated by the Carrier within the geographic limits of the port of discharge or place of delivery as shown on the face hereof ... [i]n any case the Carrier's responsibility shall cease when the Goods have been delivered to the Merchant ... or any person entitled to receive the goods on his behalf at a place designated by the Carrier.

Pl.Tr.Exh. 1. In addition, K–Line's and NYK Line's contracts state: "If required by the Ocean Carrier, this Bill of Lading duly endorsed must be surrendered in exchange for the Goods or delivery order." *Id.* Westwood's contract promises only that "if required by the Carrier one signed bill of lading properly endorsed must be surrendered by the agent of the vessel at the port of discharge in exchange for delivery order." *Id.* None of the contracts mention when such a bill is required. Sea–Land's contract states:

> (emphasis added). At the time this letter was sent, Kyong Il had not opened a letter of credit

[e]xcept at ports where Carrier delivers goods directly to the consignee, delivery shall take place and Carrier shall have no further responsibility when the goods are landed upon a safe dock, lighter or other craft and custody is taken by port or government authorities, terminal operator or lighterman. At ports where Carrier delivers goods to consignee, if the consignee does not take delivery as soon as the goods are ready, the goods shall thereafter be stored at their own risk and expense.

*Id.*

It is apparent from the provisions of the bills of lading themselves that, with the exception of APL, the contracts between Chilewich and the defendant carriers did not impose an independent obligation on the carriers to take up an original, endorsed bill of lading before delivering the hides to Kyong Il. Rather, since the hides were shipped on "C.I.F.—Mill Delivery" terms, meaning that the cost of delivering the hides had been factored into the purchase price and that the shipper bore the expense of delivering the hides to the agreed location, (Tr. at 16) it is unlikely that either party would look favorably upon a lengthy delay precipitated by the carriers' refusal to deliver the hides without obtaining original bills. This was confirmed by plaintiff's witness, David Peters, who testified that one of the reasons Chilewich employed "mill delivery" terms was to save on storage charges, since the hides would be stored at the importer's bonded warehouses prior to payment. Tr. at 82.

Chilewich's argument that language in the bills requiring delivery to the "consignee" or "unto order" indicates that an original bill of lading was required before delivery is untenable in light of the plain language of the bills themselves. Chilewich has cited no authority for interpreting these phrases to require surrender of an original bill, and the mere use of the terms "consignee" or "onto order" does not itself denote an obligation on the carriers' part to take up endorsed, original bills of lading before delivery.

for the hides and Chilewich still held the original bills of lading.

*D. Kyong Il's Insolvency*

The parties stipulate that, beginning in 1990, the period of time between Kyong Il's receipt of cattlehides at its government bonded warehouses and the opening of letters of credit to Chilewich grew progressively longer. JPTO, FF 27. While David Peters, a Chilewich partner, testified that Chilewich contemplated a period of as much as 40 days between delivery of the cattlehides and payment by Kyong Il (Tr. at 61), in April 1990, Kyong Il did not open a letter of credit until 80 days after hides were delivered. JPTO, FF 27. In February, 1991, at least 130 days passed between Kyong Il's receiving the hides and opening a letter of credit to Chilewich. *Id.*

As the time between delivery of the hides to Kyong Il and Kyong Il's opening of letters of credit grew longer, Chilewich became concerned. Their concern deepened in the fall months of 1991, as it became apparent that Kyong Il was having difficulty in opening letters of credit for the hides delivered during the summer. Their concern ripened into alarm when, in the early weeks of October, rumors of Kyong Il's insolvency circulated widely. Finally, on October 9, 1991, Chilewich asked the defendant carriers to remove the hides from Kyong Il's bonded warehouses and reconsign the hides to Kyungsong, Chilewich's Korean agent. Pl.Tr.Exh. 2. Chilewich repeated this request on October 23, 1991. *Id.*

However, when the carriers sought advice from Korean customs on the status of the hides, they learned that the hides were no longer in Kyong Il's warehouses and that Kyong Il had been charged with illegally using the hides before they were cleared through Korean customs. JPTO, FF 40–41. Although Chilewich has charged the carriers with failing to move the hides out of Kyong Il's warehouses upon request, the carriers produced a variety of evidence tending to establish their lack of control over the hides once delivered to Kyong Il's bonded warehouses. J.H. Lee, a manager at Kyong Il, testified that Kyong Il considered itself the owner of hides deposited in its bonded warehouses, and that Kyong Il would not have complied with attempts to remove the hides.

J.H. Lee Dep. at 94. The testimony of David Peters and a number of the telexes and reports admitted as evidence indicate that, at approximately the time Chilewich attempted to reconsign the hides, factory laborers at the Kyong Il plants were on strike and were preventing the passage of traffic into and out of Kyong Il's factory premises. Tr. at 26; Pl.Tr.Exhs. 3T, 3U, 3V (Telexes from NYK Korean agent), 3AA (Westwood Telex), 25B (Mitsui Telex). Finally, as discussed above, the evidence plainly showed that imported goods in Korea are highly regulated and are under the control, if not the custody, of Korean customs officials. These officials retain the keys to and periodically inspect government bonded warehouses, they train warehouse managers to comply with customs regulations and they require bonded transportation licenses to allow movement of imported goods for which customs duties have not been paid.

Shortly after the events leading to this lawsuit, Kyong Il's president fled to avoid arrest and remains in hiding. Kyong Il sought protection from its creditors under the Korean bankruptcy laws, but its petition for reorganization was denied. The parties have stipulated that the hides were processed by Kyong Il without ever being cleared through Korean customs. JPTO, FF 39.

Consequently, Chilewich seeks $1,555,-555.25, representing the value of the hides, plus pre-judgment interest and costs from the ocean carriers for what it terms "misdelivery, breach of bailment and/or conversion of cattlehide shipments carried by the defendants." Pl.'s Pre–Tr. Mem. at 1.

**DISCUSSION**

Briefly, the dispute in this case is whether the carriers properly delivered the hides to Kyong Il's bonded warehouses before receiving original, endorsed bills of lading. Chilewich claims that the carriers had an absolute duty to deliver the hides to the holder of an original bill of lading for them. Chilewich argues that the letters of guarantee offered by Kyong Il and Kyungsong were accepted by the carriers without Chilewich's knowledge and implies that the carriers delivered the hides without obtaining the original bills

of lading in exchange for the guarantees. Chilewich also argues that the carriers were bailees and breached their bailment by failing to rescue the hides from Kyong Il's warehouses once requested to do so.

### I. Delivery under the Pomerene Act

■ Notwithstanding Chilewich's claims, there is no "absolute" duty on the carriers to take up original bills of lading before delivery where this duty is imposed neither by the terms of the contract of carriage nor by the mutual understanding or agreement of the parties nor by the requirements of applicable federal law. In this case, the court concludes that such a duty did not exist and that the carriers properly delivered the hides to Kyong Il's bonded warehouses without taking up original bills.

The sales contracts between Chilewich and Kyong Il covering the shipments in suit called for a "stale" bill of lading transaction with "mill delivery" terms. In a stale bill of lading/mill delivery transaction, the hides were typically delivered to Kyong Il's "mill," or government bonded warehouse, before Kyong Il succeeded in opening letters of credit. In most cases, the hides arrived in Korea and were transported to Kyong Il's warehouses while Chilewich retained the original bills of lading. By directing the carriers to effect "mill delivery" while retaining possession of the original bills of lading, Chilewich ensured that the hides were delivered to Kyong Il's bonded warehouse before Kyong Il came into possession of an original bill of lading for the hides.

■ Chilewich held the carriers responsible for delivering the hides to Kyong Il's bonded warehouses. Tr. at 94–95. When some of the carriers hesitated to deliver the hides without presentation of the original bills of lading or a bank guarantee, Chilewich urged them to do so.[6] This is true even though Chilewich knew that Kyong Il did not possess original, endorsed bills of lading—because the bills were still in Chilewich's possession. The court agrees with Chilewich's claim that, as holders of the original bills of lading, they were the rightful owners of the hides at the time of the events in this suit. However, this claim is not alone sufficient to establish the carriers' liability for misdelivery—especially when, as here, the carriers delivered the hides to a party not in possession of the original bills at the insistence of the bill holder.

■ There is nothing in the Pomerene Act, 49 U.S.C.App. § 81 et seq. that disturbs the court's conclusion that the carriers were not obligated to take up original bills of lading before delivering the hides. 49 U.S.C.App. § 89, entitled "Delivery; when justified" states:

> A carrier is justified ... in delivering goods to one who is—(a) A person lawfully entitled to the possession of the goods, or (b) The consignee named in a straight bill for the goods, or (c) A person in possession of an order bill for the goods, by the terms of which the goods are deliverable to his order; or which has been indorsed to him, or in blank by the consignee; or by the mediate or immediate indorsee of the consignee.

The Act clearly contemplates the situation in which a party, not in possession of an order bill for the goods, is yet "lawfully entitled to possession of the goods." While the precise meaning of this phrase is elusive, the court concludes that delivery of the goods to a party at the direction of the holder of an order bill, and with whom the holder of the bill has contracted for delivery prior to sur-

---

6. On cross examination, David Peters, a partner at Chilewich, testified to the following:

Q: Had you not contracted with Kyong Il to deliver the shipments to their self-use bonded warehouse?
A: Yes.

. . . .

Q: In those instances when it came to your attention that the carriers were not moving—from your point of view as a commercial person—quickly enough with the shipments out of the port of discharge to the mill, was it not Chilewich's policy to complain to the carriers and urge them to get the shipments to the self-use bonded warehouse? Isn't that what you wanted?
A: Yes.
Q: And isn't that what you did?
A: That is correct.

See also Def.Exh. L, supra note 5; Def.Exh. Z8, infra note 8.

render of the bill, is delivery to a party "lawfully entitled to possession of the goods."

Other courts faced with similar facts under the Pomerene Act have reached similar conclusions. In *Pere Marquette Railway Company v. J.F. French & Co.*, 254 U.S. 538, 41 S.Ct. 195, 65 L.Ed. 391 (1921), the Supreme Court ruled against the plaintiff shipper where the carriers had delivered goods under an order bill to a party who had wrongfully acquired possession of the bill, even though the carriers had not taken up the original bills as required by the carriage contract, where their failure to do so was not the cause of the loss. In response to the argument that the carriers were liable in conversion for delivering the goods without taking up the original bills, the Court stated:

> There is nothing in the [Pomerene Act] which imposes upon the carrier a specific duty to the shipper to take up the bill of lading. Under § 8 [now § 88] the carrier is not obliged to make delivery except upon production and surrender of the bill of lading; but it is not prohibited from doing so.

254 U.S. at 546, 41 S.Ct. at 198 (Brandeis, J.). The Court also noted that "such liability [for misdelivery] arises not from the statute but from the obligation which the carrier assumes under the bill of lading." *Id.* As discussed above, the majority of the bills at issue in this suit do not impose an independent obligation upon the carrier to take up original bills of lading before delivery and, in light of the nature and purpose of "stale" bills of lading transactions, there is no compelling reason to read any such obligation into the contracts of carriage.

Facts almost identical to the instant case were presented to the Supreme Court of Nebraska in *Elgin Mills, Inc. v. Chicago and North Railway Co.*, 177 Neb. 110, 128 N.W.2d 384 (1964). In that case, several carloads of "vetch seed" shipped under an order bill of lading were delivered to a prospective buyer without surrender of the original bill in violation of the contract of car-

riage. The agreement between the shipper and the prospective buyer called for delivery of the seed prior to payment, in order to allow the buyer to inspect the shipment. The prospective buyer, finding the seed deficient, neither paid for the seed nor redelivered it to the shipper, who brought suit against the carrier for breach.

The Nebraska court held that the carrier was justified in delivering the seed to the prospective buyer because the buyer was a party "lawfully entitled to possession" of the seed under 49 U.S.C.App. § 89(a). The court explained:

> [t]he agreement between [shipper] and [prospective buyer] did not contemplate payment before delivery ... the delivery of the seed to [prospective buyer] was in accordance with the instructions of the owner in possession of the order bill of lading, and the failure of the railroad company to demand the order bill of lading before delivery was not the cause of the loss ... [prospective buyer] was clearly entitled to the possession of the seed by agreement with the owner without paying for it, although the possession was for a limited purpose.

128 N.W.2d at 389.

The reasoning of the Nebraska court is persuasive and corresponds to the reasonable expectations of the parties in this case. Kyong Il's agreement with Chilewich entitled it to possession of the hides albeit for the limited purpose of storage in its government bonded warehouses prior to opening letters of credit. By requiring the carriers to effect "mill delivery" without regard to surrender of the original bills, Chilewich assumed the risk that the hides could be appropriated by Kyong Il. This is not to say that Chilewich is without rights as against Kyong Il. However, Chilewich's mistaken assumption that by retaining possession of the original bills they somehow transformed the carriers into insurers of the hides must fall before the commercial realities of its transactions.[7]

---

7. Chilewich was entirely aware of the risks it assumed by proceeding under "stale" bills of lading. In response to the question of why Chile-

wich never provided letters of guarantee to the carriers, partner David Peters replied:

> We viewed it as a double risk. We were shipping goods in good faith to Korea. We had the

In *Kemper Mill & Elevator Co. v. Hines,* 293 Mo. 88, 239 S.W. 803 (1922), the Missouri court reversed a judgment for plaintiff shipper where two cars of corn meal were mistakenly delivered to the buyer, who did not have possession of the original bills of lading. The shipper had authorized the buyer to receive the corn meal. Once again, although the delivery violated the terms of the contract of carriage, the court did not impose liability on the carrier. Relying on 49 U.S.C.App. §§ 89(a) & (c), the court reasoned that since the plaintiff was the holder of the original order bill and was itself entitled to delivery, the plaintiff could certainly authorize another to receive the corn meal on its behalf, and, having done so, could not then hold the carrier liable for acting upon its request. 239 S.W. at 806.

 The logic of this case is even more compelling here, where only one of the defendant carriers, APL, was contractually obligated to take up original bills upon delivery. As the above cases show, this contractual obligation could be modified in practice by the parties' course of dealing. In this case, the evidence established that Chilewich and its agent, Kyungsong, urged the carriers, including APL, to make delivery to Kyong Il's government bonded warehouses without awaiting the surrender of original bills. See e.g., Pl.Exh. 4M (APL contract file, including faxes between Chilewich and Kyungsong in which Kyungsong requests Chilewich to advise the carriers to effect "mill delivery" without insisting on original bills of lading and Chilewich complies). Chilewich did so in the face of initial hesitation by several of the carriers, who sought a guarantee from Chilewich to offset the risk that a third party

might emerge with the bills and demand delivery. Chilewich refused to consent to any such guarantee, insisting that its rights under the carriage contracts obligated the carriers to effect "mill delivery" without regard to the surrender of the original bills.[8] By pursuing this course, Chilewich necessarily waived any rights it may have had against the carriers, especially APL, for failing to take up the original bills prior to delivery. See *Nebco International Inc. v. M/V National Integrity, et al.,* 752 F.Supp. 1207 (S.D.N.Y.1990) (shipper waived claim against carrier for delivery to party lacking bill of lading by knowledge of and consent to delivery).

## II. Delivery under the Harter Act

. Chilewich's claims under the Harter Act, 46 U.S.C.App. § 190 *et seq.,* must also fail. The Harter Act was enacted to correct for the abuse of liability disclaimers in adhesion contracts of carriage. *Koppers Connecticut Coke Co. v. James McWilliams Blue Line, Inc.,* 89 F.2d 865, 866 (2d Cir.1937). By its terms, the Act declares void any attempt by carriers to contract out of liability under maritime law for acts of misfeasance such as misdelivery and negligence in handling cargo. 46 U.S.C.App. § 190. With respect to delivery obligations, courts interpreting and applying the Act have found that it preserves the pre-existing maritime common law obligation of proper delivery. See *Farrell Lines Inc. v. Highlands Insurance Co.,* 696 F.2d 28, 29 (2d Cir.1982); *Tan Hi et al. v. United States,* 94 F.Supp. 432, 434 (N.D.Cal.1950)

 Under maritime law, proper delivery may be either actual or constructive.

---

risk of the product. *We had the risk that the customer would ultimately pay for the goods. Why would we want to give—indemnify anybody or take additional risk because of—the risk of trade was sufficient.* Tr. at 32 (emphasis added).

**8.** For example, an August 21, 1991 letter on Chilewich stationary from David Peters of Chilewich to Thomas Vaccaro of K–Line America, concerning the shipping delays of some of the hides in suit, reads in part:

We have been advised by your local representative that cargo shipped with your Steamship Company is not being released to our custom-

ers bonded warehouse without certain guarantees being made by ourselves, (the shipper) or the consignee.

. . . .

... we must take strong objection to the manner in which the situation is unfolding. We have conducted business in Korea utilizing your services for many years and to alter or change the *modus operandi* in midstream is unfair and unjust ...

Def.Exh. Z8. At the time this letter was sent, Chilewich still possessed of the original bills of lading for the shipments.

Thomas J. Schoenbraum, *Admiralty & Maritime Law*, §§ 9–15 (1987). Actual delivery may be accomplished by the transfer of full possession and control of the goods to the consignee. *Id.* In order to effect proper constructive delivery, the carrier must notify the consignee of the vessel's arrival and the time of discharge; discharge the cargo at a fit wharf; separate each consignment so as to afford the consignee ready access for inspection and removal; and protect the cargo until the consignee has a reasonable opportunity to remove it from the wharf. *Id.; Farrell Lines Inc. v. Highlands Insurance Co.*, 696 F.2d at 29. Notably absent from the common law obligation of proper delivery is the duty to take up original bills of lading before delivering the goods. This is because such a duty is not mandated by maritime common law, but is anchored more concretely in the contract of carriage, as modified by the parties' course of dealing and by the requirements of federal law. As stated above, in this case neither the parties nor federal law required surrender of the original, endorsed bills before delivery of the hides.

■ The parties to this case sowed prodigious confusion by focusing, both at trial and in their supporting trial memoranda, on the delivery obligations of the carriers "as modified by the law of the port," in this case Korea. This testimony was offered, ostensibly, to demonstrate and rebut the defendants' claim that they were unable to withhold delivery of the hides to Kyong Il until they received original bills of lading, because had they done so they would have violated Korean law requiring the prompt removal of imported goods from the discharge port. Experts on Korean customs law argued the case for both sides.

However, this question, which does not even appear settled in Korea, need not be decided here. Rather, the evidence demonstrates that Chilewich not only expected the carriers to deliver the cattlehides to Kyong

Il's bonded warehouses without first receiving original bills of lading, but even urged them to do so. Therefore, the parties need look, not to the commands of Korean law or to the maritime law requirements of proper delivery, but to the contracts of carriage and to their own reasonable expectations. These contracts required "mill delivery" to be effected at the order of the shipper, the holder of the original bill of lading. Where the procedures employed to effect "mill delivery" do not require surrender of the original bill of lading by the importer, as here they did not, the carriers cannot be expected to impose such a requirement, especially where an undue delay in delivery of the goods would result.[9]

### III. The Letters of Guarantee

■ Chilewich also claims that the issuing of certain letters of guarantee by Kyong Il and Kyungsong, Chilewich's Korean agent, to the defendant carriers in order to encourage the prompt shipment of the hides is evidence of the carriers' lack of good faith in delivering the hides to Kyong Il without demanding surrender of the original bills. This claim is controverted with respect to Kyong Il's guarantees by the deposition testimony of the carriers' Korean agents, most of whom testified that the receipt of such guarantees is customary in the Korean hide trade and is designed to provide some assurance that, absent surrender of the original bills of lading, the party to whom the hides are delivered is entitled to possession of the hides. Kang Seok Han (Korean agent for NYK) Dep. at 26; J.H. Lee (Kyong Il) Dep. at 89; Tai Hyun Lee (Korean agent for Mitsui) Dep. at 37; Yeong Suk Park (Korean agent for APL) Dep. at 34–35; Jae Choon Park (Korean agent for K–Line) Dep. at 73. As recognized by the agents themselves and by Judge Kimba Wood in a pre-trial order denying summary judgment in this case, the "mill delivery" obligations of the carriers existed independently of any letters of guarantee,

---

9. There is also some controversy concerning whether the carriers could, at their option, refuse to release the hides upon Kyong Il's presentation of the transportation licenses, or whether the carriers were compelled to release the hides automatically at the risk of wrathful Korean customs officials. Again, the court does not consider it necessary to opine on this subject, as it is apparent from the bills of lading themselves that the carriers were obligated to effect "mill delivery" at the order of Chilewich, who retained possession of the original bills of lading.

which were redundant to the carriers' obligations under the bills of lading. See, *Chilewich Partners v. M.V. Alligator Fortune, et al.*, 1992 WL 315412 (S.D.N.Y. October 20, 1992)

The carriers' acceptance of letters of guarantee from Kyungsong, Chilewich's Korean agent, is more troubling because it suggests that in this case, the carriers were seeking extraordinary assurances against liability. However, without expressing any opinion as to whether these guarantees were issued with either the awareness or approval of Chilewich, or were within the scope of Kyungsong's agency, the mere fact that these guarantees were issued and may have been improper is of no relevance to the pre-existing "mill delivery" obligations of the carriers. As with the Kyong Il letters of guarantee, the Kyungsong guarantees were redundant of the carriers' obligations under the bills of lading. Neither Kyong Il's nor Kyungsong's guarantees were causative agents of the loss here suffered by Chilewich, for even had such guarantees not been tendered, and the hides simply delivered pursuant to the "mill delivery" terms of the bills of lading, Kyong Il would still have obtained possession of the hides prior to payment and would have been able to make use of them, unlawfully, in precisely the same way.

*IV. Breach of Bailment*

■ Finally, Chilewich's claim against the carriers for breach of bailment must also fail. Bailment is defined as

delivery of personalty for some particular purpose, or on mere deposit, upon a contract, express or implied, that after the purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions, or kept until he reclaims it, as the case may be.

8 C.J.S. Bailment § 2; *Rich v. Touche Ross & Co.*, 415 F.Supp. 95, 99 (S.D.N.Y.1976). The elements of bailment are the intent to create a bailment, delivery of possession of the bailed items, and acceptance of the items by the bailee. *Id.* at § 19.

■ Assuming, *arguendo*, that the carriers were bailees of the cattlehides for the purpose of delivering them to Kyong Il's government bonded warehouses, by the terms of the contract of carriage under which the hides were delivered the carriers' bailment ended upon "mill delivery"—the delivery of the hides to government bonded warehouses belonging to Kyong Il. It was at this point that the hides left the possession and control of the carriers and entered into the custody of Kyong Il. Chilewich claims that, because it retained possession of the original order bills, custody and control over the hides remained with the carriers. However, the facts clearly show that the carriers' control over the hides ended upon their deposit at Kyong Il's government bonded warehouses. At that point, the hides were reported to Korean customs officials and could be neither used nor removed without the consent of those officials under penalty of Korean customs law.

Moreover, the carriers' contractual responsibility over the hides ended upon the successful completion of "mill delivery"—the delivery of the hides to government bonded warehouses located on Kyong Il's factory premises. Neither Chilewich's requests, on October 9 & 23, 1991, to remove the hides from Kyong Il's possession, nor Chilewich's retention of the original bills of lading, were sufficient to reestablish the bailment relationship.

## CONCLUSION

For all of the above reasons, the plaintiff's claims are dismissed. This Opinion constitutes the court's findings of fact and conclusions of law under Fed.R.Civ.P. 52(a). The court orders judgment to be entered in accordance herewith.

So ordered.